| 16 | 149 |
|----|-----|
| 62 | 498 |
| 16 | 149 |
| 75 | 447 |

## The HARTFORD BRIDGE COMPANY *against* The Town of EAST-HARTFORD.

The ferry between the towns of *Hartford* and *East-Hartford* was a franchise belonging to the ancient town, before its division in 1783, subject to the same legislative supervision and controul as other ferries in this state.

Upon the division of such ancient town, no part of the franchise passed to the new town, except by virtue of a legislative provision to that effect; it being settled, that when a part of the inhabitants and territory of an older town are erected into a new corporation, the old town retains all the property, rights and privileges previously belonging to it, and is subject to all its previous duties and liabilities, at least as it regards property, which has no fixed location in the new corporation.

This franchise was corporate property strictly, in contradistinction to property belonging to the individuals residing within the limits of the corporation.

Upon the division of a town, it is a right of the legislature, which has been often exercised and never questioned, to divide the corporate property and corporate burdens, according to its sense of justice and its pleasure.

The interest in the ferry given to *East-Hartford*, by its act of incorporation,

*Hartford,*
*June,* 1844.

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

was "the privilege of keeping one half of the ferry across the *Connecticut* river, at the place or places where it had been usually kept, *during the pleasure of the Assembly* ;" and as that town accepted its charter with this provision, it cannot, by virtue thereof, now claim greater rights than it conferred.

The bridge of the *Hartford Bridge Company* having been destroyed, and the causeway injured, the General Assembly, in 1818, upon the application of that company, passed a resolve or act, providing, that whenever said *Bridge Company* should have repaired the bridge and raised the causeway, to the acceptance of the commissioners originally appointed for that purpose, the ferries by law established between the towns of *Hartford* and *East-Hartford* should be discontinued ; and after directing in what manner the bridge should be constructed and the causeway repaired, and that they should be approved and accepted by the commissioners, the act provided, that unless they should be thus re-built and repaired, it should be lawful for the towns of *Hartford* and *East-Hartford* to revive said ferries. The bridge and causeway were re-built and repaired under the superintendence of, and were approved and accepted by, the commissioners. Held, 1. that the commissioners were the sole judges whether the requirements of the act, as to the re-building and repairing of the bridge and causeway, had been complied with; 2. that such requirements having been complied with, the ferries were by law discontinued.

The ferry in question not having been used as a public ferry, and no boats kept thereat to transport passengers, &c., from the year 1818 to 1836; it was held, this was a non-user for a period long enough to create a legal presumption of of an abandonment.

The General Assembly, in 1808, incorporated a bridge company, with authority to collect tolls, and, in the act of incorporation, prescribed the manner in which the bridge and causeway should be constructed, and required other expenses to be incurred ; and then it provided, that whenever the tolls should reimburse to the company the sums advanced by them in building the bridge and the other expenses referred to, with an interest of twelve *per cent. per annum* thereon, the bridge and causeway, and rate of toll, should be subject to such regulations and orders as the General Assembly should think proper to make. After some other provisions, not material here, it was provided, that the grant might receive such alterations from time to time, by the General Assembly, as experience should evince to be necessary or expedient. The charter, with these provisions, was accepted by the company ; and the expenses thereby required were incurred, the works completed, and the bridge and causeway approved by the commissioners. The first bridge having been carried away by a flood, in 1818, the General Assembly, by an act passed in *May* of that year, made provision for the erection of a new bridge and causeway, and directed suitable and necessary alterations to be made in the construction thereof, which alterations were such as, when made, to supersede the necessity of the ferry ; and to carry out fairly the provisions of the original charter, and to provide an indemnity for, and reimbursement of, the increased expenditures imposed by the prescribed alterations, it was provided, that the ferry should be discontinued. To this act was annexed a proviso, that it might, at any time thereafter, be altered, amended or repealed, by the General Assembly, in the same manner, as the original act incorporating said *Bridge Company.* On a bill in chancery, brought by the *Bridge Company,* against *East-Hartford,* for an injunction restraining the defendants from the further use of the ferry, it was held, 1. that the act of 1818 was a contract between the state and the corporation, not only granting privileges, but im-

posing burdens, and requiring continuing duties attended with expense; 2. that the corporation having accepted the charter and complied with its requirements, the rights and duties of both parties became fixed and vested, and the legislature had no constitutional power to impair this contract, without the assent of the corporation, unless by virtue of an authority for that purpose, reserved in the charter itself; 3. that the charter ought to be so construed as to carry out the great objects intended by it, which were, first, to make a great and necessary public improvement, at great expense, and secondly, to reimburse those who should venture their money in the undertaking; 4. that the charter constituted a public pledge, that until the expenses of the corporation, with the stipulated interest, should be reimbursed, the General Assembly would not make any regulations or orders materially affecting the prescribed revenues of the corporation; 5. that the subsequent reservation of power in the same section of the charter, is not to be construed so as to defeat the declared purpose of the General Assembly, to preserve the granted privileges of the corporation inviolate until after it should be fully compensated for its disbursements; but it was to such alterations in the prescribed structure of the bridge and causeway, and perhaps in the mode of supervision and management, as experience should evince to be necessary or expedient, that the legislature, in this clause, had reference; 6. that the acts of 1836 and 1842, purporting to revive the ferry, without reference to the reimbursement of the corporation, and before it had been made, were repugnant to the constitution of the *United States*, as impairing the obligation of the contract, and were therefore void; 7. that the defendants having invaded the franchise of the plaintiffs, and continuing such invasion, the relief sought by the bill ought to be granted. [One judge dissenting.]

*Hartford,*
June, 1844.

The Hartford
Bridge Compa-
ny,
*v.*
East-Hartford.

This was a bill in chancery for an injunction against the defendants, restraining them from the further use of the ferry between the towns of *Hartford* and *East-Hartford*.

The defendants, in their answer, stated certain matters in denial or avoidance of the claims of the plaintiffs. The court, at an adjourned term, held at *Hartford,* on the 1st of *May,* 1843, appointed *Ebenezer Learned* and *John Stewart,* Esqrs., a committee to find and report the facts alleged in the bill and answer. After a full hearing of the parties, the committee made their report to an adjourned term of the court, held on the 2nd *Tuesday* of *June,* 1843. Against the acceptance of this report, the defendants filed a remonstrance; the hearing of which, for want of time, was postponed until the stated term of the court in *September,* 1843. The defendants were then heard upon the exceptions in their remonstrance; and the court accepted and established the report, with some modifications. As the report, thus modified, embraces the whole case, it will be sufficient for the present purpose, to give an abstract of it.

*Hartford,*
*June, 1844.*
————————
The Hartford
Bridge Compa-
ny.
*v.*
East-Hartford.

In the month of *December*, 1681, the town of *Hartford* passed a vote regulating the tolls to be taken at the ferry over *Connecticut* river, at a place between the present town of *Hartford* and what is now the town of *East-Hartford ;* and authorizing the select-men to agree with some suitable person to keep it at that place, and to let it to him for seven years ; and also to get the passage as cheap for the inhabitants of the town as might be.   On the 31st of *March*, 1682, said ferry was, by the town of *Hartford*, leased to *Thomas Cadwell*, for the term of seven years.   On the 13th of *December*, 1687, the lease was renewed to him, for the further term of seven years.   On the 27th of *December*, 1694, the town of *Hartford* appointed a committee to agree with a person to attend the ferry, upon the best terms in their power. On the 10th of *January*, 1696, this committee agreed with said *Thomas Cadwell*, to take the ferry for seven years, upon the following terms : first, that he should carry over all travellers, at the price the General Court had stated ; secondly, that he should carry over all the inhabitants, as he should agree with them, and those whom he should not agree with, at certain rates specified.   At the session of the General Assembly in *October*, 1695, the tolls to be taken both at the *Hartford* and *Windsor* ferries, were regulated by law ; and the tolls to be taken at the *Hartford* ferry were regulated, by subsequent legislative enactments.   From the year 1681 until *October*, 1783, said ferry continued to be the franchise of the town of *Hartford*, and during this period, was used and enjoyed as such, by that town alone.

The General Assembly, at their session in *October*, 1783, incorporated the town of *East-Hartford*.   The act of incorporation contained the following clause : " And the privilege of keeping one-half of the ferry across *Connecticut* river, at the place or places where the same has been usually kept in said town of *Hartford*, shall belong to *East-Hartford*, during the pleasure of this Assembly."   On the 1st of *February*, 1810, the town of *Hartford*, for the consideration of an annual rent of forty-five dollars, leased its moiety of said ferry to *Daniel Buck* and *Elisha Williams*, for the term of five years.   The payment of the rent reserved in said lease was duly made, by the lessees, up to the year 1814, when, in consequence of the reduced travel across the ferry, the town of

*Hartford* exacted of them no rent thereafter. But certain individuals interested in the business and real estate on *Ferry-street*, and others, at their own expense, procured a ferry-boat, which was run across said ferry, and from which they received no toll whatever, and no compensation other than an allowance made by the ferryman, for the use of the boat. The town of *Hartford* made no opposition to this use of their right, which continued until the year 1818.

At the session of the General Assembly in *October*, 1808, upon the petition of *John Watson* and others, an act or resolve was passed, incorporating the petitioners, by the name of the *Hartford Bridge Company*, granting them liberty to erect a bridge across *Connecticut* river, and to build a causeway through the meadows of *East-Hartford*; which act or resolve is contained in the volume of *Private Acts*, at the 254th page, and was, by the committee, made a part of their report. Among the provisions of this act are the following: "Which bridge shall be built with arches, supported on solid stone piers, the faces of which shall be made of suitable stone, hammer-dressed and laid in lime mortar. The height of the piers shall be thirty-two feet above common low water mark in the month of *August*, in common seasons."—"The super-structure shall consist of arches of wood, so constructed, that the travel shall be on a horizontal line in the chord of the arch."—"Said company shall make a suitable draw in said bridge, of the width of thirty-four feet, for the passing of vessels, at such place as shall be directed by the committee appointed by the General Assembly, as is hereinafter provided; and all vessels shall be permitted, at all times, to pass said draw, without payment of toll."—"Whenever said company shall have completed said bridge and causeway, to the acceptance of said committee, they may erect a gate or gates on said bridge and causeway, and are hereby authorized to demand and receive from all persons passing said bridge and causeway, the following tolls," [specifying them.]—"Said company shall, at all times, at their own expense, keep said bridge and causeway in repair, so long as they shall receive said tolls, and shall keep a fair account of all the expenses of making, building, and keeping in repair said bridge and causeway, together with the tolls collected thereon; a copy of which accounts, so adjusted, said committee shall annually

*Hartford,*
June, 1844.
___
The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

lodge in the office of the treasurer of this state; and exhibit to the committee appointed according to the provisions of this act, when said bridge and causeway shall be completed, and annually forever afterwards; and the said accounts shall be annually adjusted and settled, and the balance due to said company ascertained, by said committee; and said committee, or a major part of them, shall determine when said bridge and causeway are so completed as to entitle said company to the collection of toll."—" *Jonathan Brace, John Caldwell* and *Andrew Kingsbury*, Esqrs. are hereby appointed the standing committee, for all the purposes mentioned in this resolve; and all vacancies which shall happen in said committee, by death, resignation, or removal, shall, from time to time, be supplied by the General Assembly; and the fees and services of said committee shall be paid by said company, and charged in their account of expenses. And whenever the said tolls shall reimburse to said company the sums advanced by them, in building said bridge and causeway, and the expense of lighting, maintaining and repairing said bridge and causeway, and of collecting the toll, and of the expenses and services of said committee, with an interest of twelve *per cent. per annum* on the same, the said bridge and causeway, and the rate of toll, shall be subject to such regulations and orders as the General Assembly shall think proper to make."—" Provided, that nothing in this grant shall now, or at any future time, in any way lessen, impair, injure or obstruct the right to keep up and maintain the ferries established by law between the towns of *Hartford* and *East-Hartford;* nor prevent or hinder any person or persons crossing said river in their own boats, or on the ice.—And also provided, that the causeway may be reduced to the heighth of back water in freshets, if in the judgment of the committee, it shall be expedient; and that if the bridge or causeway is, at any time, out of repair, in the opinion of the committee, they shall be authorized to direct that no toll be received until repairs are made : and also, that the grant may receive such alterations, from time to time, by the General Assembly, as experience shall evince to be necessary or expedient : and also provided, that the travel on a public road leading across said causeway shall not be molested or hindered; and that persons and teams shall be allowed

to pass over the causeway free of toll, in pursuing their usual farming business in *East-Hartford* meadows."

*Hartford,*
June, 1844.

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

The plaintiffs, in pursuance of said act of incorporation, erected a bridge across *Connecticut* river, and built said causeway through the meadows of *East-Hartford*, and in all things pursued the provisions contained in said act of incorporation, except that said bridge was not so erected that the travel was on a horizontal line, in the chord of the arch ; nor were the piers as high as contemplated by the act of incorporation ; but said bridge and causeway, after they were completed, were accepted by *Jonathan Brace, John Caldwell* and *Andrew Kingsbury*, Esqrs., a standing committee by the General Assembly appointed for all the purposes mentioned in said act ; who gave a certificate of said acceptance, under their hands, dated *March* 26th, 1811, in these words : " We, the subscribers, &c., do certify, that we have examined said bridge and causeway, and declare the same to be so far completed as to entitle said company to erect a gate or gates on said bridge and causeway, and to demand and receive from all persons passing them the toll provided by law." No objection to the mode or manner of the erection of said bridge, in not having the travel thereon on a horizontal line in the chord of the arch, nor to the height of said piers, was made known, until after the petition, which the plaintiffs preferred to the General Assembly, at their *October* session, in the year 1817 ; but the General Assembly has once and again acted upon the subject of the tolls of said bridge, and other interests appertaining thereto, and granted the plaintiffs a new charter in the year 1818, without there being any claim that the charter of 1808 was forfeited, by a non-compliance with any of the conditions thereof.

On the 3d of *October*, 1817, the plaintiffs preferred their petition to the General Assembly for a discontinuance of said ferry, which petition was continued, with an order of notice, to the session of the General Assembly in *May* 1818 ; when the resolve printed among the *Private Acts* of the General Assembly, *p.* 258. was passed. By the first section or paragraph of this resolve, it is provided, "That whenever said bridge company shall have repaired said bridge without a draw, and shall have raised and repaired the causeway to the acceptance of the commissioners appointed by the original

grant, the ferries by law established between the towns of *Hartford* and *East-Hartford* shall be discontinued; and said towns shall thereafter never be permitted to transport passengers across said river, unless on the happening of the contingency hereinafter mentioned." The next section or paragraph is as follows: "Said company shall, within eighteen months from the rising of this Assembly, rebuild said bridge, and the piers shall be raised to the acceptance of said commissioners, not exceeding four feet higher than they now are. A suitable draw shall be erected, and placed over the channel of the river, at the *West* end of the bridge, not less than thirty feet wide; and the bridge shall be built on the chord of the arch, and not on the crown thereof, conformably to the directions in the original grant; and the causeway shall be raised to the acceptance of said commissioners, not exceeding three feet higher than it now is; and said bridge shall be accepted and approved, by said commissioners, appointed by the General Assembly as aforesaid; and unless said bridge shall be rebuilt, and said causeway be repaired as herein provided, it shall be lawful for the towns of *Hartford* and *East-Hartford*, to revive said ferry, and improve the same, in the same manner and with the same privileges, as if said ferry had not been discontinued. And no toll shall thereafter be collected on said bridge until the same be rebuilt as aforesaid." At the close of the resolve is the following proviso: " Provided this act may, at any time hereafter, be altered, amended or repealed, by the General Assembly, in the same manner as the original act incorporating said *Bridge Company.*"

Under this resolve, the plaintiffs expended large sums in the repairs of said bridge and causeway, under the inspection of said *Jonathan Brace, John Caldwell* and *Andrew Kingsbury,* Esqrs., who were, by the General Assembly, constituted a committee or commissioners to superintend the repairs on said bridge and causeway. And in erecting and repairing said bridge, the plaintiffs, from time to time, received directions from said committee or commissioners; which directions were followed and obeyed; and said bridge and causeway were repaired and ready for the accommodation of the public, on the 1st of *December,* 1818; of which the commissioners gave a certificate in the following words:

" The subscribers, having been, by the General Assembly,

appointed commissioners, to superintend the building of a <span>Hartford,<br>June, 1844.</span> bridge over *Connecticut* river, at *Hartford*, and to decide whether said bridge has been built, and the causeway in *East-* <span>The Hartford<br>Bridge Compa-</span> *Hartford* meadows repaired, according to the intention of the <span>ny<br>*v.*</span> resolve passed in *May* last ; have, at different times, given <span>East-Hartford.</span> directions respecting said bridge and causeway, and carefully examined the progress of the work, until it is claimed, by the *Bridge Company*, that the whole has been finished agreeably to said resolve ; whereupon the commissioners have carefully inspected the bridge, piers and causeway, and find, that the whole work has been done in a substantial, workmanship manner, and according to the requirements of said resolve, excepting the draw, which is supposed not to have been constructed according to the *strict* and *literal wording* of the resolve, though, in their opinion, it meets the object intended by the General Assembly, and of all those persons who have a particular interest in the draw.   The resolve requires, that it should be thirty feet wide ; the opening between the *Western* abutment and the pier is more than that distance, but the opening in the bridge, is about twenty-four feet.   The commissioners are, therefore, of opinion, that the *Bridge Company* have complied with the *spirit* and *intention* of said resolve, and do thereupon accept and approve of said bridge and causeway."

In the erection of said bridge by the plaintiffs, that part of the wood work or floor of said bridge, which is opened or unfolded for the passage of vessels, was constructed only twenty-four feet and seven inches wide, while the space underneath, between the abutment and pier of said bridge, on the *West* side, through which the hull of vessels must pass, is more than thirty feet wide.   No delay was ever occasioned to any vessel in passing through said bridge, for want of space or room through which to pass ; nor did it appear to the committee, that any objection against the width of the passage through said bridge, was ever raised by the public, or by those who are in the habit of passing with their vessels through said bridge, until after the year 1836.   And the committee were of opinion and found, that notwithstanding the opening in the wood-work of said bridge, through which vessels are to pass, does not exceed twenty-four feet, seven inches, in width, yet there is adequate room for the accommodation of

all who have occasion to pass through said bridge with their vessels; and no inconvenience is suffered, by the public, in consequence of the narrowness of the passage through the wood-work of said bridge. And although the rights of the plaintiffs in relation to said bridge, and their compliance with or violation of the terms and provisions of their several charters, have been frequently, both incidentally and directly, the subjects of discussion and debate before the General Assembly, and their decision upon said points been had, yet has no real or apparent non-compliance, on the part of the plaintiffs, with the terms or provisions of the charter of 1818, in neglecting to make the opening in the wood-work of said bridge for the passage of vessels wider than twenty-four feet and seven inches, ever been deemed or adjudged, by said General Assembly, a violation of said charter, or a forfeiture thereof, notwithstanding they have once and again been urged to come to such a conclusion.

On the 21st of *April,* 1837, *S. W. Mills* and others preferred their petition to the General Assembly, to be holden at *Hartford,* on the 1st *Wednesday* of *May,* of the same year, complaining, among other things, of the width of the draw of said bridge; upon which petition, at the same session, a report of the joint standing committee on roads and bridges, adverse to the prayer of the petitioners, was made and accepted.

When the town of *Manchester,* by an act of the General Assembly, passed at their session in *May,* 1823, was incorporated into a town, and set off from the town of *East-Hartford,* no notice was taken in that act of any interest of the town of *East-Hartford* in said ferry. See *Private Acts, p.* 1155.

Upon the petition of *Caleb Stockbridge* and others, to which the towns of *Hartford* and *East-Hartford* were made parties respondents, the General Assembly, at their session in *May,* 1836, passed an act, the first section of which is in these words: "*Resolved,* that so much of the resolution passed by the General Assembly, at their session in *May,* 1818, upon the petition of the *Hartford Bridge Company,* as abolishes or interdicts the ferry between the towns of *Hartford* and *East-Hartford,* and prohibits the transporting of passengers across

said river, be, and the same is hereby repealed." See *Private Acts, p.* 565.

From the year 1836 to the year 1841, the town of *East-Hartford* ran a ferry-boat across *Connecticut* river, at said ferry; and in the month of *January*, 1839, a part of said bridge was carried away, by a freshet in said river, and was thereby rendered impassable, during the greater part of that year; in consequence of which the town of *Hartford* ran a horse ferry-boat across said river, until the month of *November* following, when the bridge was repaired and rendered fit for the accommodation of travelers. During the latter part of the time that they so ran their boat, they ran it upon an agreement made by the select-men of the towns of *Hartford* and *East-Hartford*, to divide the avails or income received, between these towns; and they did divide the same in pursuance of said agreement.

In *May*, 1841, the repealing act of 1836 was, upon the petition of the plaintiffs, repealed.

In *May*, 1842, the General Assembly, upon the petition of the town of *East-Hartford*, passed an act or resolve in the following words :

" *Resolved*, that so much of the resolution passed by the General Assembly, at their session in *May*, 1841, upon the petition of the *Hartford Bridge Company*, as abolishes or interdicts the ferry between the towns of *Hartford* and *East-Hartford*, or the right of the town of *East-Hartford* to keep and maintain the same, and prohibits the transport of passengers across said river, by said town of *East-Hartford*, be, and the same is, hereby repealed.

" *Resolved further*, that the right of the town of *East-Hartford* to keep and use said ferry for the transport of passengers across said *Connecticut* river, between the towns of *Hartford* and *East-Hartford*, as possessed by said town of *East-Hartford*, prior to said act of 1841, is hereby restored and confirmed to said town of *East-Hartford ;* and the said town is hereby authorized to exercise said right and continue said ferry, taking such toll thereat as the General Assembly have provided, or may hereafter provide, for transporting passengers, teams, and vehicles across said river, at said place."

On the 14th of *May*, 1842, the select-men of the town of *Hartford*, on the application of the plaintiffs, subscribed an

indenture, subject to the approval of the inhabitants of the town, in town meeting, whereby they released and conveyed to the plaintiffs all such interest as the town had in said ferry and its privileges ; for which the plaintiffs, on their part, covenanted to pay the town the sum of 1200 dollars, in twelve equal annual payments of 100 dollars each.  At a town meeting held on the 18th of *May*, 1842, said indenture was accepted and approved, and to all intents and purposes ratified and confirmed, on the part of the town, with a proviso, that at any time after the term of twelve years, the interest in the ferry so conveyed, should revert to said town, they refunding to the plaintiffs one half of the amount so paid.   The plaintiffs immediately afterwards accepted and ratified the contract as modified.   But the plaintiffs have not, since the execution of this instrument, run any boat across said ferry ; nor made any provision for the accommodation of the public travel at said ferry ; nor commenced, until the date of this bill, a suit at law or bill in equity against the defendants.

From the time the ferry was restored to *East-Hartford*, in the year 1836, to the time of commencing the present suit, the plaintiffs did not bring any action at law, or other suit, against the town of *East-Hartford*, to try their right to said ferry.

From time immemorial until the year 1818, no boats other than flat-bottomed scow-boats moved by oars, had been used on said ferry ; but from the year 1836 until this time, the town of *East-Hartford*, when using said ferry, has run a horse-boat at said ferry.   With the exception of the time when the bridge of the plaintiffs has been impassable, and the town of *Hartford* has by law been compelled to keep up said ferry, the town of *Hartford* has not made any use of said ferry as a franchise, or derived any benefit or emolument therefrom, since the year 1814.   From the time when the bridge of the plaintiffs was completed in the year 1818, until after the passage of the resolve of the General Assembly in *May*, 1836, the ferry between the towns of *Hartford* and *East-Hartford* was not used as a public ferry ; and no boats, during that time, were kept thereat, by the towns of *Hartford* and *East-Hartford*, or either of them, to transport passengers, freight, &c. From the time when said ferry was restored, by the General Assembly, in 1836, until it was discontinued in 1841, the town

of *East-Hartford* has received, for ferriages and tolls collected at said ferry, which, during said time, has been carried on solely by that town, a large sum of money, *viz.* more than 10,000 dollars.

Hartford,
June, 1844.

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

After the year 1814, the ferry between the towns of *Hartford* and *East-Hartford* was not kept up, by both or either of said towns; but individuals, upon their own responsibility and at their own cost and charges, managed said ferry, and collected toll thereon, until the bridge first erected by the plaintiffs, was partially or wholly destroyed, in the year 1818; when by law said towns were compelled to keep boats at said ferry for the accommodation of the public travel; which the town of *Hartford* relinquished and abandoned, as soon as the plaintiffs rebuilt or repaired their said bridge; the erection of which relieved the towns of *Hartford* and *East-ford* from the necessity and expense of maintaining boats suitable for crossing the meadows in time of flood.

Since the completion of the bridge of the plaintiffs in 1811, they have ever been accustomed to take toll according to law, of all who have made use of their bridge; nor has any person disputed or resisted their right, upon the pretence that either the first or the second bridge was not constructed according to the provisions of their several grants or charters.

The plaintiffs have invested in said bridge and causeway a large sum of money. The bridge and causeway erected by them, under the grant or charter of 1808, and which was accepted and approved by the commissioners or standing committee appointed by the General Assembly, cost more than 96,000 dollars. To reconstruct said bridge, under the grant or charter of 1818, and to rebuild said causeway, and to make in said bridge and causeway such alterations and improvements as were directed by the act of the General Assembly, the plaintiffs expended about 30,000 dollars; and for various other repairs and expenditures on said bridge and causeway, the plaintiffs have disbursed a further sum of 47,000 dollars and upwards; so that the standing committee or commissioners on said bridge, when settling the accounts of the *Hartford Bridge Company*, on the 12th of *April*, 1842, found and reported to the General Assembly, that there was, on that day, due to the plaintiffs, for arrears of in-

*Hartford,*
*June, 1844.*

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

terest on the capital by them invested, at the rate of twelve *per cent. per annum*, the sum of 227,270 dollars, 89 cents.

Although some of the inhabitants of *East-Hartford, Glastenbury,* and other towns are personally accommodated, by a continuance of the ferry, especially when their business in the town of *Hartford* calls them into *State-street,* or parts of that town lying *South* of *State-street,* inasmuch as the distance which they are under the necessity of travelling is considerably diminished, and the toll or fare which they are compelled to pay, is less at the ferry than at the bridge; still it is only when the river is low, in the *Summer* season, and the weather not windy and boisterous, that the ferry is preferable to the bridge, even to these individuals. But the committee were of the opinion, and found, that said ferry is not of public convenience and necessity, nor do the interests of the community require its continuance. The committee further found, that the bridge of the *Hartford Bridge Company* is not only highly advantageous to the prosperity and increasing growth, both of the towns of *Hartford* and *East-Hartford,* but is of great public convenience to all who have occasion to cross *Connecticut* river at this place. The value of real estate, both in the towns of *Hartford* and *East-Hartford,* has been greatly enhanced since the erection of said bridge, and in consequence of the facilities of intercourse with the city of *Hartford,* and places contiguous, thereby furnished; and said bridge is of great public convenience and necessity, and is abundantly adequate to accommodate all who may wish to come to or depart from *Hartford* across *Connecticut* river, between the towns of *Hartford* and *East-Hartford;* neither can the inhabitants of *Hartford* or *East-Hartford,* nor the community at large, dispense with said bridge. The real estate in the towns of *Hartford* and *East-Hartford,* since the erection of said bridge, and by reason of the facilities thereby furnished to travelers and others, has, in the opinion of the committee, been increased in value to an amount greater than all that has been expended by the plaintiffs in the erection and support of said bridge and causeway, since the year 1808; and were said ferry of public convenience and necessity, it could not be made, at all seasons of the year, both by night and by day, so safe and commodious as the bridge of the plaintiffs now is, and has ever been. At the time of the passage

of the act of 1818, the tolls which the plaintiffs were before that time authorized to receive, were much reduced.

The legislature have, from time to time, taken into consideration said bridge and ferry, and the interests and rights of the public in relation thereto, by several acts and resolves, the most important of which have already been noticed. See *Priv. Acts*, 260. 261. 564. 565. *Resolves of* 1839, *p.* 55.

The question as to what decree should be passed, or what disposition should be made of the case, was reserved for the consideration and advice of this court.

*Bissell* and *Hungerford,* (with whom was *Parsons,*) for the plaintiffs, contended, 1. That the defendants have not a vested right in the ferry in question, which the legislature could not deprive them of, without compensation. In the first place, the legislature have always exercised a controul over this ferry, in common with most of the other ferries in the state, regulating and varying the fares, prescribing the manner of tending it, &c. See the principal Act and the notes thereto, and the additional Acts, under tit. *Ferries, Stat.* 314 to 328. ed. 1808. Secondly, if an indefeasible right existed anywhere, it was vested in the town of *Hartford,* and so continued until the incorporation of the town of *East-Hartford,* in *October,* 1783 ; and the whole right still remains vested in *Hartford,* except so much as was then given to the new town, and what has since been transferred to the plaintiffs. Thirdly, by the act incorporating the town of *East-Hartford,* no other interest in the ferry was given to that town than an interest to continue *during the pleasure of the General Assembly.* Fourthly, the legislature, by the act of 1818, suppressing the ferry, and again by the resolve of 1841, discontinuing it, exercised its reserved authority, and put an end to the interest of *East-Hartford* in the ferry, except so far forth as it might be revived, upon the contingencies expressly provided for in the former act. Fifthly, if the right to the ferry, previous to the incorporation of *East-Hartford,* was vested in the town of *Hartford,* which embraced the territory of *East-Hartford,* still upon the division of the town, the General Assembly might divide the town property between the two towns, as they thought just and reasonable. This has been the immemorial and constant practice. Sixthly, so much of the fran-

*Hartford,*
*June, 1844.*

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

chise as was taken from *East-Hartford,* by the act suppressing the ferry, returned to and was revested in the town of *Hartford.* Seventhly, after it had so revested in the town of *Hartford,* it was not in the power of the General Assembly again to divest the town of *Hartford* of it, and give it to the town of *East-Hartford. Portland* v. *Windham,* 4 *Mass. R.* 289. *Richards* v. *Daggett, Id.* 533. *Minot* v. *Curtis,* 7 *Mass. R.* 441. 444. *First Parish in Brunswick* v. *Dunning, Id.* 445. *Thompson* v. *Franklin,* 16 *Mass. R.* 76. *North-Hempstead* v. *Hempstead,* 2 *Wend.* 109. Eighthly, the legislature took from the town of *East-Hartford* no valuable franchise, but merely released them from a burden.

2. That the plaintiffs have complied with the conditions of their grant, and are therefore entitled to the full benefit of the provisions in their favour. The principal objection under this head, is, that the plaintiffs have not constructed their bridges as required by their charters. It is insisted, by the defendants, that the bridge erected under the original charter of 1808, was built upon the crown, and not upon the chord, of the arch ; that the piers were not made as high as the charter specified ; and that the draw of the last bridge was not made of the width directed by the act of 1818. And the defendants claim, that they were not divested of the right of keeping up the ferry until the bridge and draw were made precisely as that act provided. To this claim there are most satisfactory answers. In the first place, the original bridge was made under the superintendence of the commissioners appointed by the General Assembly for that purpose, and was accepted by that committee ; whose acts were decisive upon the subject. Secondly, whether the acts of the committee were conclusive or not, the General Assembly, as well as the public, acquiesced in, and approved of, this mode of construction. Thirdly, it is quite immaterial whether the first bridge was in precise conformity with the provisions of the charter or not, inasmuch as the act of 1818 expressly refers to the bridge &c. as it *then was* ; and points out and directs the additions and alterations in the bridge and causeway, as they then were ; upon the completion of which, it gives the plaintiffs expressly the benefit of the provisions contained in the charter in their favour. Fourthly, in respect to the bridge last built, the draw and the causeway, the commis-

sioners were authorized to determine whether they were, or were not, built according to the spirit and intention of the resolve; and their decision is conclusive upon the subject. If it were not conclusive, it would do very great injustice to the plaintiffs, inasmuch as the decision was made in six or seven months after the act of 1818 was passed, and the plaintiffs were, by this act, allowed the period of eighteen months for performance on their part; and if the draw were not such as the act required, the plaintiffs might, within the time limited, have very easily made it so. Fifthly, the legislature have, by their acquiescence and various acts, admitted the performance of the contract by the plaintiffs, or if not, have at least waived any further performance. *The People* v. *The Manhattan Company*, 9 *Wend.* 351. And if further performance was dispensed with, by the legislature, this dispensation has the same effect as a full and complete performance by the plaintiffs. *Pease* v. *Phelps*, 10 *Conn. R.* 62. The towns of *Hartford* and *East-Hartford* also acquiesced in the construction of the bridge and draw, as is shown by their discontinuing the exercise of the franchise from 1818 to 1836.

3. That after the General Assembly had terminated the interest of the defendants in the ferry, by the act of 1818, they had no constitutional power to revive it in favour of the defendants, and confer upon them the rights which they have attempted to give them. This raises the question as to the true construction of the charter, and is the great point in the case. The plaintiffs contend, that the General Assembly had no such power. The proviso of the original act is: " That the causeway may be reduced to the heighth of the back water in freshets, if, in the judgment of the committee, it shall be expedient; and that if the bridge or causeway is, at any time, out of repair, in the opinion of the committee, they shall be authorized to direct that no toll be received until repairs are made; and also, that the grant may receive such alterations, from time to time, by the General Assembly, as experience shall evince to be necessary or expedient." The proviso of the act of 1818 is: "Provided, that this act may, at any time, hereafter be altered, amended or repealed, by the General Assembly, in the same manner as the original act incorporating said *Bridge Company*." Here it is to be observed, in the first place, that the act of 1818 stands upon the

*Hartford,*
*June,1814.*

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

same basis as the original act, so far as relates to the right of alteration or repeal.    Secondly, the charter must be construed according to the mutual understanding of the parties, at the time of entering into the contract ; and such understanding is to be collected from the terms and provisions of the charter. Whatever is done or omitted, by one party or the other, in violation of that understanding, is a breach of faith, impairing the contract.    7 *Conn. R.* 48.    Thirdly, by the act of 1818, liberty is granted to the plaintiffs to erect a permanent bridge, and also to build a causeway through *East-Hartford* meadows ; and then it is provided, that they shall have the right of reimbursing themselves, by a toll collected from all persons passing said bridge and causeway ; and when they shall be reimbursed, by the toll, the sums advanced by them in building said bridge and causeway, and the expense of lighting, maintaining and repairing said bridge and causeway, and of collecting the toll, and of the expenses and services of said committee, with an interest of twelve *per cent. per annum* on the same, the said bridge and causeway, and the rate of toll, shall be subject to such regulations and orders as the General Assembly shall think proper to make.    *Priv. Acts,* 254. 256. Fourthly, the power reserved was that of making "*alterations*" from time to time, and not an entire repeal or abrogation of the charter at once.    Fifthly, the alterations were to be such as "*experience evinced to be necessary or expedient.*" At the time of the grant, there had been no experience as to the mode of constructing the bridge and causeway, and the success of the undertaking generally ; and great doubts were entertained, whether a bridge could be made to stand, and as to the best mode of constructing it.    The alterations, therefore, which were to be proved by experience to be necessary or expedient, were alterations merely in the form and structure of the bridge and causeway.    The necessity or expediency of repealing the charter *in toto,* was not to be subject to the test of experience.    Sixthly, but what is decisive is, the charter authorizes the plaintiffs to build the bridge and causeway, and then makes an explicit agreement with them, that they may reimburse themselves, with interest, at a certain rate, out of the tolls ; and that they may collect these tolls of all persons passing the bridge and causeway.    The bridge, causeway and tolls are to be subject to the regulations and

Hartford,
June, 1844.

The Hartford
Bridge Compa-
ny
v.
East-Hartford.

orders of the General Assembly, *after the Company are thus reimbursed.* These provisions imply, in the most unequivocal language, that the plaintiffs do not hold at the pleasure of the General Assembly; but that they may, at all events, reimburse themselves out of the tolls; and that until they have so done, the General Assembly have not the power of repealing the charter, or exercising any general controul over the tolls. Seventhly, the suppression of the ferry in 1818, constituted a most essential part of the *consideration* for the contract, on the part of the plaintiffs; and but for this part of the consideration, they would not have erected the bridge of 1818; and if the General Assembly could, by restoring the ferry, divest the plaintiffs of the benefit of this part of the consideration, they might, in like manner, divest them of the whole, and, at the same time, compel them to submit to the burdens imposed by the charter.

4. That if the defendants have a right to keep up a ferry over *Connecticut* river, they have no right to make use of horse-boats for the transportation of persons or property. In the first place, the act of 1783, incorporating *East-Hartford*, gave the defendants only a portion of the franchise before vested in *Hartford*, and had the effect merely of apportioning the franchise between the two towns. Secondly, the right which *Hartford* or *East-Hartford* had, prior to the act of 1818, was merely by virtue of an usage; and the right is commensurate with the extent of that usage; but until 1818, and indeed until 1836, no boats other than flat-bottomed scow-boats, moved by oars, had been used on said ferry.

5. That if the plaintiffs are entitled to relief, the relief sought by this bill, is the appropriate one. 2 *Sto. Eq.* 206. and authorities cited *ibid. Croton Turnpike Road* v. *Ryder,* 1 *Johns. Ch. R.* 611. *Livingston* v. *Ogden,* 4 *Johns. Ch. R.* 48. *Ogden* v. *Gibbons, Id.* 150. 174. S. C. on appeal, 17 *Johns. R.* 488. *North River Steam Boat Co.* v. *Hoffman,* 5 *Johns. Ch. R.* 300. *Newburgh and Cochecton Turnpike Road* v. *Miller, Id.* 111. Numerous other authorities might be cited.

*Toucey* and *Chapman,* contra, remarked, 1. That the acts of the defendants complained of in the bill, were done under the authority of the General Assembly. The whole legisla-

HARVARD LAW SCHOOL LIBRARY

tive power of the state was exerted to authorize them. The ferry was originally established, and has ever since been regulated, by the same power. The interposition of the court is now sought to enforce disobedience to the legislative department of the government, and thus to bring the two departments into collision. This extraordinary and transcendent jurisdiction will not be exercised, except in very clear cases; nor after the plaintiffs have slept upon their supposed rights, or indulged unreasonable delay. There are some subjects, moreover, the cognizance of which belongs appropriately, and, if not expressly delegated to another forum, exclusively, to the legislature. Such are matters of policy and expediency: such, especially, are the necessity and convenience of a public ferry.

2. That from a period as far back as 1695, until 1818, the franchise in question was vested, first, in the ancient town of *Hartford,* and then in *Hartford* and *East-Hartford,* and not in the plaintiffs, as bridge-owners. It is alleged in the bill to be a ferry granted to *Hartford,* and that it was the franchise of *Hartford;* and the committee have so found it. It has been recognized as such, by the General Assembly, during the period above specified; and was distinctly recognized, not only by the General Assembly, in the charter of 1808, but by the plaintiffs themselves, in their acceptance of that charter. The counsel for the defendants then contended,

3. That that part of the act of 1818, which suppresses the ferry, or interdicts its use, is unconstitutional and void. That this species of property is, in its nature, as inviolable as any other, has not been, and cannot be, controverted. It is so considered, by all the authorities. 11 *Pet. R.* 605. This property was taken from its proprietors, without compensation. The act was against the fundamental law of society; it was legislative robbery; it was repudiation, without excuse or palliation.

4. That the plaintiffs cannot avail themselves of this part of the act, because they did not comply with the terms on which the ferry was to be suppressed. The draw was not built of the width explicitly required. The duties enjoined by the charter of an incorporated company, are *conditions* attached to the privileges conferred. *The People* ex rel.

*Bishop* v. *The Kingston and Middletown Turnpike Co.* 23 *Wend*. 193.

But it is said, that the bridge with this draw, was *approved* by the commissioners. To this proceeding the defendants were not parties; and their rights cannot be affected by it. It might authorize the plaintiffs to take toll of passengers; but it could not satisfy a condition, on the performance of which those who were nowise concerned in the act of approval, were to lose their property. 14 *Conn. R.* 157.

Again, it is said, the General Assembly have waived performance. In the first place, the mere want of action by the General Assembly, is not a waiver. Secondly, the General Assembly might expressly waive a forfeiture of the charter, without its taking away the rights of *East-Hartford.* Thirdly, a judgment of forfeiture is not necessary to authorize a restoration of the ferry.

5. That the plaintiffs have no legal or equitable right, as against the defendants, because the acts of 1808 and of 1818 were both subject to the controul of the General Assembly. No contract was made, and no public faith was pledged, not subject to such controul. In the first place, the reserving clause is to be construed *strictly* against granting away the right in question. The plaintiffs are a company of *adventurers;* and, by a settled rule of construction, any ambiguity in the terms of a contract between them and the public, must operate against them, and in favour of the public; and they can claim nothing that is not clearly given them. *Stourbridge Canal* v. *Wheeley,* 2 *B. & Adol.* 792. 11 *Pet. R.* 544. Secondly, the reserved power is co-extensive with the right of eminent domain. Thirdly, the resolves or acts of 1836 and 1842, do not touch the tariff of tolls, or the construction of the reserving clause. Fourthly, if they had directly altered and reduced the tolls, they would have been within the scope of the reserving clause. There had been an *experience* of eighteen years, *evincing,* in the opinion of the General Assembly, the *necessity or expediency* of an *alteration.* Of the existence of such necessity or expediency, the General Assembly must, of course, be the exclusive and final judge. There is no limitation as to the *nature* or *subjects* of the alteration. If the structure, height and width of the bridge and causeway may be altered, from time to time, at the expense and incon-

*Hartford,*
*June, 1844.*

The Hartford
Bridge Compa-
ny
*v.*
East-Hartford.

venience of the defendants, why may not the facilities of public travel be increased, by an alteration, which leaves the bridge, and causeway, and supervision, precisely as they were, and affects the interests of the company, in a less degree, perhaps, than the alterations first-mentioned would ?

6. That the right of the plaintiffs was not strengthened, by the release of the town of *Hartford.* In the first place, the town of *Hartford* had not the right of *East-Hartford* to release. Secondly, the plaintiffs were incompetent to take a release or conveyance of the ferry, or to become ferry-owners. Thirdly, a court of chancery will not regard the release as having any effect, or entitled to any consideration, in this case, because the plaintiffs procured it to suppress the ferry, and thwart the action of the legislature. (*a*)

7. That the title of the plaintiffs, if they have any, being doubtful; and they being chargeable with *laches*, having brought no suit to enforce their claims since 1836 ; chancery will not interfere by injunction.

CHURCH, J. Some of the questions involved in this case are of unusual importance, and have presented difficulties in their solution ; and they have received our careful and deliberate attention. A majority of us, for the reasons which we shall suggest, are of opinion, that the facts appearing upon the report of the committee, are sufficient to sustain the plaintiffs' bill.

We are not called upon now to enquire into the condition of ferries, as they have been treated here, from the origin of our colonial government—whether they were considered as burthens upon towns, and which the towns were under legal obligations to support, as they do highways and bridges, or whether they were supported as valuable privileges or franchises conferred by grants. It seems, at any rate, that the ferry in dispute, from a very early period, has been considered, by the legislature, in all its dealings with it, as a franchise, and especially by the act or resolve of 1783, dividing the ancient town of *Hartford.*

(*a*) Some further considerations were urged under this head, and the point was fully discussed, by the counsel for the defendants ; but as the counsel for the plaintiffs placed their case, and the court have decided it, on other grounds, the statement in the text will probably be deemed sufficient for the present purpose.—*R.*

*Hartford,*
*June,* 1844.

The Hartford
Bridge Compa-
ny.
*v.*
East-Hartford.

As early as 1702, and probably before that time, the General Court exercised a jurisdiction over ferries. Rates of toll were regulated by law, and the management of ferries prescribed. Whether such a jurisdiction, so long exercised and universally submitted to, affords a legal presumption that ferry franchises were granted and received, subject to an implied power reserved over them, so that they might be essentially modified, or entirely suppressed, at the pleasure of the legislature, we do not suppose it necessary now to determine.

The plaintiffs do not claim here as owners of the ferry, or, as having, by reason of their lease from the town of *Hartford,* any right, in such capacity, to participate in its tolls. We do not enquire, therefore, what rights the town of *Hartford* has had, or still has, to the ferry; or what rights the *Bridge Company* acquired under that lease. The town of *Hartford* makes no claim now; and the town of *East-Hartford* makes no claim under it. The question is only, what are the rights of the *Bridge Company,* as against *East-Hartford?* If the plaintiffs, as against that town, have the exclusive right, by virtue of the amended or additional charter of 1818, to receive the tolls from persons crossing *Connecticut* river at this place, and are essentially disturbed by the defendants, in the enjoyment of the right they assert, they are entitled to the remedy they ask. *Croton Turnpike Co.* v. *Ryder,* 1 *Johns. Ch. R.* 615. *Livingston* v. *Ogden,* 4 *Johns. Ch. R.* 48. *Ogden* v. *Gibbons, Id.* 150. *Newburgh Turnpike Co.* v. *Miller,* 5 *Johns. Ch. R.* 101. 2 *Story's Eq.* 206.

In opposition to this, the town of *East-Hartford* insists, that the privilege of keeping one half of the ferry in this place, belongs to that town, not only by reason of the franchise belonging to the ancient town of *Hartford,* but also by force of the act of 1783, dividing that town.

It is conceded all around, that this ferry was a franchise belonging to the old town, before its division, and was probably subject to legislative supervision and controul, as all other ferries in the state, to some extent, were. By the act dividing the ancient town, and constituting the town of *East-Hartford* a new and distinct corporation, the legislature granted to the new town the privilege of keeping one half of the ferry, during the pleasure of the General Assembly.

If it be conceded, that the legislature did not, by reason of

*Hartford,*
*June,* 1844.

The Hartford
Bridge Compa-
ny.
*v.*
East-Hartford.

ancient prerogative, possess the power of general controul over this ferry; yet, upon the division of the town of *Hart-ford,* no part of the franchise would have passed to the new town, only by virtue of a legal provision to that effect. We suppose it to be well settled, that, when a part of the inhabitants and territory of an older town are erected into a new corporation, the old town retains all the property, rights and privileges formerly belonging to it, and is subject to all its former duties and liabilities, at least, as it regards property which has no fixed location in the new town, as lands, buildings, &c. Inhabitants of *Windham* v. Inhabitants of *Portland,* 4 *Mass. R.* 384. *Hampshire* v. *Franklin,* 16 *Mass. R.* 76. *North-Hempstead* v. *Hempstead,* 2 *Wend.* 109.

This franchise was corporate property, strictly : it did not belong to the individuals residing within the ancient limits of *Hartford,* as private persons. And, we believe, upon the division of towns in this state, the legislature has always divided the corporate property and corporate burthens, according to its sense of justice, and its pleasure, without being suspected, in so doing, of interfering with vested rights. Therefore, the town of *East-Hartford,* upon its separation from the parent town, received only such share of the corporate property and franchises, and under such conditions and qualifications, as the legislature thought proper to prescribe, especially, " the privilege of keeping one half of the ferry across *Connecticut* river, at the place or places where the same had been usually kept in said town of *Hartford, during the pleasure of the Assembly."* *East-Hartford* accepted its town charter, with this provision ; and cannot, by virtue of it, now, claim greater rights than it conferred.

Another enquiry is thus made necessary. Has the General Assembly declared its pleasure, by revoking the privilege conferred upon the town of *East-Hartford ?* The resolve of 1818 provides, in the first place, that, whenever the *Bridge Company* shall have repaired the bridge, and raised the causeway, to the acceptance of the commissioners originally appointed for that purpose, the ferries established by law between the towns, should be discontinued. It proceeds to direct in what manner the bridge should be constructed, and the causeway raised ; and that they should be approved and accepted, by the commissioners, and that, unless they should

be thus re-built and repaired, it should be lawful for the towns to revive and improve the ferry again. We think it quite clear, from this provision of the resolve, that the commissioners were to be the sole judges in this matter; and that, whether the ferries should be discontinued or not, should depend upon the action of the commissioners in this respect. The language employed in the first part of the resolve, is unequivocal: "Whenever said bridge company shall have repaired said bridge without a draw, and shall have raised and repaired said causeway, to *the acceptance of the commissioners*, &c., the ferries by law established between the towns of *Hartford* and *East-Hartford* shall be discontinued," &c. The commissioners, in fact, superintended and directed the work during its progress; and they approved and accepted it, when completed, for the reasons which they give in their certificate; and these reasons, the committee, in their report, declare to be sufficient. Thus, by force of this resolve, the ferries were by law discontinued.

From the time when the bridge was completed, in 1818, until the year 1836, say the committee, said ferry was not used as a public ferry, and no boats were kept thereat, to convey passengers, &c. Here was a non-user for eighteen years,—a period long enough to create a legal presumption of an abandonment. *Corning* v. *Gould*, 16 *Wend.* 531. *Wright* v. *Freeman*, 5 *Carr. & Johns.* 467. *Lawrence* v. *Obee*, 3 *Campb.* 514.

But in addition to this, the legislature again declared its pleasure, by revoking the ferry franchise, by the resolution of 1841.

Although there have been some other questions suggested, in this discussion, yet, we think, the only remaining one, and indeed, the question chiefly important in the case, is, whether the legislature had the constitutional power to revive the ferry, after it was suppressed, by the resolutions of 1818 and 1841, in the absence of any neglect or forfeiture, on the part of the *Bridge Company?* Or, whether an attempt to do this, was not in conflict with the chartered rights of the company, as guarantied by the resolve of 1818?

That resolve was an additional or amended charter, granted to the *Bridge Company*, and thus a contract between the state and the company, which the legislature had no power to

impair, without the assent of the corporation, unless by virtue of an authority for that purpose, reserved in the charter itself. This is conceded; and it is claimed by the defendants, that such authority was reserved; and whether it was or not, depends upon a sound, common sense construction of the charter.

The amended charter of 1818 refers to the original one of 1808; and therefore, it is necessary to consider them in connexion. These charters, like all other acts of legislation, ought to be so construed, as to carry out the great objects intended by them. These were here; first, to make a great and necessary public improvement, at great expense, by erecting a bridge over *Connecticut* river; secondly, to reimburse those who should venture their money in the undertaking.

This charter of the *Bridge Company* is more clearly a contract between the public and the corporation, than most others, which have been adjudged to be contracts inviolable. Ordinary charters only grant privileges, and are executed contracts; but this imposes burthens, and requires the performance of continuing duties, of an expensive character. It does not merely grant the power of erecting a bridge, with the privilege of collecting tolls, in such way, and at such expense, as the company shall please; but it directs the manner in which the bridge and causeway shall be constructed, regardless of the cost; and it withholds from the company any power of reimbursement, until its requirements are fulfilled. Having prescribed the duties and fixed the obligations of the corporation, justice demanded that the charter should confer the corresponding privilege of entire compensation; and this having been done, it constituted a mutual and reciprocal contract, with known parties, consideration and obligations. To confer upon the *Bridge Company* the power and privilege of perfect reimbursement for the risks and expenses of the proposed undertaking, the public granted certain tolls, by the original charter, and declared, " that whenever said tolls shall reimburse to said company the sums advanced by them in building said bridge and causeway, with an interest of 12 *per cent. per annum* on the same, the said bridge and causeway, *and the rate of toll*, shall be subject to such regulations *and orders* as the General Assembly shall think proper to make." This charter, with this stipulation, was offered to the compa-

ny ; and upon the faith of this, it was accepted, and the expense incurred, the work completed, and the bridge and causeway accepted by the commissioners. The rights and duties of both parties were now fixed and vested ; and each had a right to demand performance of the other ; the state, to require the company to keep the bridge in repair, and to comply with all prescribed regulations in regard to its supervision and management, so long as it received tolls, at least, and to subject it to indictment or prosecution for neglect ; (*Susquehannah & Bath Turnpike Co.* v. *The People*, 15 *Wend.* 267.) and the company, to require of the public a fulfilment of its pledge of the given tolls, until it was reimbursed its expenses, and the stipulated interest. The import of the language used in this part of the charter, cannot be mistaken. It constitutes a public pledge, that, until the company shall be reimbursed, the General Assembly will not make any regulations or orders materially affecting the prescribed revenues of the *Bridge Company.* For why should a power to make regulations and orders, *after reimbursement,* be reserved, if full power existed to make them as well before as afterwards ? To construe this stipulation in the charter otherwise, would do violence to its language, as well as to the intention of the legislature. For, we think, that the purpose of the General Assembly to preserve the granted privileges of the company inviolate, until after it should be fully compensated for its disbursements, is as prominent and obvious, as that it intended the bridge and causeway should be constructed upon the stipulated plan. If the General Assembly intended a reservation of greater powers, it was bound to speak plainly, and not use deceptive or equivocal language—language,which the *Bridge Company* would probably, and might reasonably, understand in a different sense.

The legislature, having declared its purpose so very clearly, in this part of the original charter, it is not to be presumed it would be retracted in a subsequent provision of the same section. There must be a manifest repugnance even between distinct statutes, much more between different parts of the same statute, to warrant a court in declaring that there has been a repeal, by implication. The repugnancy must be irreconcilable. *Dwarris on Stat.* 673. *McCarter* v. *Orphan Asylum,* 9 *Cowen,* 437. *Commonwealth* v. *Kimball,* 21 *Pick.*

*Hartford,*
June, 1844.

The Hartford
Bridge Company
*v.*
East-Hartford.

Hartford,
June, 1844.

The Hartford
Bridge Compa-
ny
v.
East-Hartford.

373.   *Bowen* v. *Lease*, 5 *Hill*, 221.   And yet, here it is claimed, notwithstanding, that, a little further on, in the same section of this charter, a full power is reserved, by the General Assembly, at all times, to alter, amend or repeal it—at any rate, power sufficient to justify the legislature in essentially diminishing the tolls of the company, before it has been reimbursed its outlays in the erection of the bridge and causeway. The language of the charter, supposed to reserve such a power, is this: "And also provided, &c., that the grant may receive such alterations, from time to time, by the General Assembly, as *experience* shall evince to be necessary or expedient."   If it was here intended, by the legislature, to reserve an *unlimited controul over this charter, in all its provisions,* and at all times, the language used is unusual and inadequate for this purpose.   Why was not the ordinary language used, which is employed in all our charters where such a power is reserved—"This act may, at any time, be altered, amended or repealed, by the General Assembly?"   Instead of this, the grant may only *receive alterations*, from time to time, and then only as experience shall evince to be necessary or expedient—not an intimation, as in the former provision, of a reserved power over its tolls or revenues.   How ought we, in view of the real condition of things, when this charter was granted, to understand this provision?   Certainly, not as repealing or abrogating the former one, which secured reimbursement; but as being consistent with and preserving it. An untried experiment was to be made.   It could not then be known, whether the form or mode of construction which was prescribed by the charter, would prove to be the best, either for the public accommodation, the safety of the bridge or the interest of the company.   Experience alone could determine this.   And therefore it was, to alterations in the structure of the bridge and causeway, and perhaps in the mode of supervision and management, to which the legislature had reference; and not a power over the tolls or income of the company, which are expressly secured in the former part of the charter.   A power to alter, is not ordinarily to be intended as a power of repeal, or a power to destroy.

A majority of us, therefore, believe, that these different charter stipulations, which we have been considering, do not conflict with each other, but refer to distinct subjects.   The

former one secures to the *Bridge Company* its tolls and revenues free from legislative controul until after reimbursement has been made ; and the latter reserves to the General Assembly a power to direct necessary or convenient alterations in the construction of the works, &c. as experience shall suggest their propriety. These are our views of the original charter.

*Hartford,*
*June, 1844.*

The Hartford
Bridge Company.
*v.*
East-Hartford.

In connexion with this, it becomes our duty to consider the charter or resolve of 1818, which, it is supposed, reserves the power to the General Assembly, claimed by the defendants ; because this, as will be seen, refers to the former for the measure of the powers reserved. The bridge, which was erected under the first charter, was carried away, by a flood, in the *Winter* of 1818 ; and experience had demonstrated, that essential alterations in the construction of the bridge and causeway were necessary, to avoid in future the inconveniences and disasters to which both the public and the company had been subjected. The very case had occurred, which had been anticipated, and which induced the legislature to reserve the power to make alterations from time to time. And thereupon the General Assembly, by the resolve of *May*, 1818, directed suitable and necessary alterations to be made ; which alterations the committee find were such, when made, as to supersede the necessity of the ferry. And to carry out the fair terms of the original contract between the public and the company, and to provide an indemnity for, and reimbursement of, the increased expenditures imposed by the prescribed alterations, it was here provided, that the ferry should be discontinued ; and that the towns of *Hartford* and *East-Hartford* should never thereafter be permitted to transport passengers across the river, unless upon the happening of certain contingencies. In this way, it was provided, that a portion at least of the tolls collected at the ferry, should be received by the *Bridge Company*, and become a substantial part of its revenues ; as much so, as the tolls specifically provided by the amended charter.

This, now, became one of the stipulations of the contract, equally obligatory upon the state, as any of the stipulations regarding tolls, and which could not be constitutionally impaired, without the consent of the *Bridge Company*, unless under some authority reserved for that purpose. And the

*Hartford,*
June, 1844.

The Hartford
Bridge Compa-
ny.
*v.*
East-Hartford.

great question, after all, is, whether the General Assembly, by the resolve of *May*, 1818, intended to reserve a power to take this revenue, thus granted to the *Bridge Company*, away from it, by reviving the ferry, or otherwise, before the company had been reimbursed its expenses and interest, according to the provision of the charter of 1808 ?   The defendants suppose such a power is reserved, by the proviso of the charter of 1818.  Thus it reads : " Provided, that this act may, at any time hereafter, be altered, amended or repealed, by the General Assembly, *in the same manner as the original act incorporating said Bridge Company.*"   A general power of alteration, amendment and repeal, is certainly not here reserved, but a qualified one only; otherwise, the above language in italics is entirely surplusage,—it means nothing. But, we think, this language of the proviso is very significant, and was used for the purpose of carrying into effect one of the great purposes of the original charter ; which, as we have before said, was, to reimburse those who should venture their money in erecting the bridge, &c.   The power of alteration and repeal is here expressly confined to the extent of the same power as defined in the original charter.   And why should it not be ?   Additional expenses were made necessary, by the alterations prescribed by this resolve ; and a fund, in addition to the tolls before receivable, was provided for their reimbursement.   Why then should not this new provision for compensation, as well as the former one, be guarded from legislative invasion ?   If to effect this was not the purpose of the legislature, in using the peculiar language of this proviso, we know not what that language means.   We have said, that the power of repeal in the original charter, was dependent upon a previous reimbursement of the company the amount of their expenses, with an annual interest of twelve *per cent.*   No greater power of repeal is reserved, by the proviso of the resolve of 1818.

But the General Assembly, by its resolution of 1842, has attempted to revive the ferry, without reference to the reimbursement of the company, and before it has been made. This was in direct opposition to the positive pledge of the legislature, in the resolve of 1818.  Thus, the franchise granted to the company, has been invaded, and the obligation of the contract impaired, as we think, without constitutional au-

thority.   And we must advise the superior court, that the prayer of the plaintiffs' bill ought to be granted.

In this opinion Waite and Storrs, Js., concurred.

Hinman, J. dissented on the principal point, being of opinion, that the General Assembly had the constitutional power of reviving the ferry, after its suppression in 1818, by virtue of the reservations in the original and additional charters.   In most, if not all, of the positions of the court not bearing on this point, he concurred.

Williams, Ch. J., being interested in the event of the suit, was not present when the case was argued, and gave no opinion.

Injunction to be granted.