## COMMISSIONERS ON INLAND FISHERIES *vs.* HOLYOKE WATER POWER COMPANY.

The provision of the Rev. Sts. *c.* 44, § 23, and Gen. Sts. *c.* 68, § 41, declaring that acts of incorporation shall be subject to amendment, alteration or repeal at the pleasure of the legislature, reserves to the legislature the authority to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant or any rights vested under it, and which the legislature may deem necessary to secure either that object or other public or private rights.

After a manufacturing corporation, chartered with authority to construct and maintain a dam across a river, paying damages to the owners of fishing rights above, and whose charter does not expressly exempt it from maintaining the dam without a fishway and is subject under the Rev. Sts. *c.* 44, § 23, and Gen. Sts. *c.* 68, § 41, to amendment, alteration or repeal at the pleasure of the legislature, has paid such damages, and constructed the dam without a fishway, so as to destroy the fishing.rights above, and to impair fishing rights below, for the injury to which last no compensation has ever been made or provided, that corporation, or any other which purchases its dam under the authority of a subsequent statute, may be constitutionally required by the legislature to construct a fishway in the dam to the satisfaction of commissioners appointed for the purpose.

GRAY, J.[*] The material facts of this case, as appearing by the report of Mr. Justice Colt, before whom the hearing was had, are few and simple.

The defendants, under the authority conferred upon them by their charter, St. 1859, *c.* 6, are the owners by purchase of a dam across the Connecticut River, and the locks and canals connected therewith, at Holyoke in this Commonwealth, erected by the Hadley Falls Company in accordance with its charter, St. 1848, *c.* 222, and kept up ever since, for the purpose of creating and maintaining a water power for manufacturing and mechanical purposes. .

The charter of the Hadley Falls Company provided that i' should pay such damages to the owners of fishing rights then existing above the dam which it was thereby empowered to construct, as might be assessed by the county commissioners, and that either party might apply to them "to ascertain and determine the damages to said fishing rights," and might appeal from their assessment to a jury, as in cases of laying out high-

[*] The chief justice did not sit in this case, and it was argued before all the other judges in June 1870.

ways. St. 1848, c. 222, §§ 4, 5. And such damages were duly assessed and paid.

It was admitted that, before this dam was built, shad were accustomed to pass up the Connecticut River beyond, as far as Turner's Falls, and were of value to citizens of the Commonwealth, being private owners of riparian fishing rights, for sale as food, and were a source of income to such riparian proprietors upon the river, both above and below the dam; and that the dam prevented the passage of fish up the river, and destroyed the fishing rights above.

It was proved at the hearing, that since the building of the dam the number of shad in the river below had gradually decreased from various causes; and that a small, but appreciable, portion of such decrease was due to the maintenance of the dam, which prevented the fish from passing up to their former spawning grounds above, and to some extent caused them not to return to the river after their annual passage to the sea. But it did not appear that any owners of fishing rights below the dam had ever claimed damages on this account.

The plaintiffs, as commissioners on inland fisheries, appointed by the governor and council, and pursuant to the authority conferred on them as such commissioners by the Sts. of 1866, c. 238; 1867, c. 344; and 1869, c. 384, § 2; after due notice to the defendant corporation, examined its dam, and determined the mode in which a fishway should be constructed therein, suitable and sufficient, in the opinion of the commissioners, to secure the passage of salmon and shad up the river and over the dam in their accustomed seasons. Such a fishway would cost about thirty thousand dollars, and, as was proved at the hearing, would not diminish the water power of the defendants except when they may desire to add to the present height of their dam by flashboards. The commissioners furnished the defendants with a plan and specification of such fishway, filed a copy of the same in the office of the secretary of the Commonwealth, and required the defendants to build and complete a fishway in accordance therewith, or to agree with the plaintiffs for the construction of such a fishway. But the defendants

refused and neglected for thirty days to comply with this request, upon the ground that they were not required by law to do so, and that the Commonwealth had no power or right to command or require them to build such a fishway. The plaintiffs thereupon, in their own names, but in behalf of the Commonwealth, and in accordance with the St. of 1869, *c.* 422, filed this bill in equity to compel the construction of such a fishway.

The defendants contend that the statutes of the Commonwealth, under which they have been required to make this fishway, are inoperative and void, because they impair the obligation of the contract contained in the charter from the Commonwealth to the Hadley Falls Company, (whose rights the defendants have,) and so contravene that article of the Constitution of the United States which prohibits the states from passing any law impairing the obligation of contracts. The question to be determined therefore is, What was the contract between the Commonwealth and the Hadley Falls Company? This question must be answered by the application, to the charter of that company, of well settled principles of constitutional law and of the construction of statutes, which it will be convenient to state, before proceeding to a particular consideration of the terms of this charter.

In England, where the powers of the legislature are unfettered by a written constitution, and no act of a prior parliament can abridge the power of a subsequent one, there could be no doubt of the authority to pass a statute requiring the owner of any dam to erect and maintain such fishways as commissioners appointed for the purpose might prescribe. 1 Bl. Com. 90, 160, 161. *Hodgdon* v. *Little*, 14 C. B. (N. S.) 111, and 16 C. B. (N. S.) 198. *Rolle* v. *Whyte*, Law Rep. 3 Q. B. 286, 306.

In the United States, it has been settled for more than half a century, by the decisions of the supreme court, that a grant or charter from a state legislature is a contract, within the meaning of the article of the Constitution which declares that no state shall pass any law impairing the obligation of contracts. *Fletcher* v. *Peck*, 6 Cranch, 87. *Terrett* v. *Taylor*, 9 Cranch, 43 *Dartmouth College* v. *Woodward*, 4 Wheat. 518. In a still ear

lier case, Chief Justice Parsons, delivering the judgment of this court, clearly stated the true rule, saying : " We are satisfied that the rights legally vested in this, or in any corporation, cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation." *Wales* v. *Stetson*, 2 Mass. 143, 146.

But no act of the legislature is to be declared invalid by the courts, as a violation of a paramount and controlling article of the Constitution, unless the repugnancy between the two is manifest and unavoidable. When a statute has been passed with all the forms requisite to give it the force of law, it must be regarded as valid, unless it can be clearly shown to be in conflict with the Constitution. *Fletcher* v. *Peck*, 6 Cranch, 87, 128. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 625. *Norwich* v. *County Commissioners*, 13 Pick. 60.

In this country, as in England, every grant from the sovereign power is, in case of ambiguity, to be construed strictly against the grantee and in favor of the government. The rights of the public are therefore not to be presumed to have been surrendered to a corporation, except so far as an intention to surrender them clearly appears in the charter. The grant of a franchise from the Commonwealth for one public object is not to be unnecessarily interpreted to the disparagement of another. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544–548. *Perrine* v. *Chesapeake & Delaware Canal Co.* 9 How. 172, 192. *Richmond, Fredericksburg & Potomac Railroad Co.* v. *Louisa Railroad Co.* 13 How. 71. *Cleaveland* v. *Norton*, 6 Cush. 383, 384. *Boston* v. *Richardson*, 13 Allen, 146, 156. It is upon this principle that it has been held that a general authority to lay out highways will not warrant the laying out of a highway over navigable waters; that a charter for the construction of a turnpike or railroad from one place to another will not authorize the grantees to obstruct an existing highway, unless such obstruction is necessary to give a reasonable effect to the statute; and a grant of land covered by tide water does not affect the power and duty of the legislature to protect the public rights of navigation and fishing over it. *Commonwealth* v. *Coombs*, 2 Mass. 489

*Wales* v. *Stetson,* Ib. 143. *Springfield* v. *Connecticut River Rail-road Co.* 4 Cush. 63. *Commonwealth* v. *Alger,* 7 Cush. 53.

As was said by Chief Justice Shaw, in *Commonwealth* v. *Essex Co.* 13 Gray, 239, 247 : " It is plainly within the province of the legislature to determine and regulate the use of all common and public rights and easements. The rights of navigation on tide waters, and of the use of streams not navigable for boats and rafts, are public, and such rights are subject to regulation. It sometimes happens that the full enjoyment of two public rights would, to some extent, interfere with each other; as where a highway, turnpike or railroad crosses a navigable or boatable stream. It is then for the legislature to determine which shall yield, and to what extent, and whether wholly, or in part only, to the other; and such questions will ordinarily be determined by the legislature, according to their conviction of the greater preponderance of public necessity and convenience."

By the law of Massachusetts, the erection and maintenance of a mill-dam to raise a water power for manufacturing and mechanical purposes is doubtless a public use, for which private property and rights may be taken, making due compensation. *Hazen* v. *Essex Co.* 12 Cush. 475. *Commonwealth* v. *Essex Co.* 13 Gray, 249, 250. *Talbot* v. *Hudson,* 16 Gray, 417, 422. But the right to have migratory fish pass, in their accustomed course, up and down rivers and streams, though not technically navigable, is also a public right, and may be regulated and protected by the legislature in such a manner, through such commissioners or other officers, and by means of such forms of judicial process, as it may deem appropriate; and every grant of a right to maintain a mill-dam across a stream where such fish are accustomed to pass is subject to the condition or limitation that a sufficient and reasonable way shall be allowed for the fish, unless cut off by express provision or obvious implication in the grant. This is settled by a series of cases, and was indeed admitted by the learned counsel for the defendants at the argument. *Stoughton* v. *Baker,* 4 Mass. 522. *Commonwealth* v *Chapin,* 5 Pick. 199. *Vinton* v. *Welsh,* 9 Pick. 87. *Common-*

*wealth* v. *Alger,* 7 Cush. 98–101. *Commonwealth* v. *Essex Co.* 13 Gray, 247–250.

The legislature of the Commonwealth, before the granting of the charter of the Hadley Falls Company, had declared that every act of incorporation, passed since the 11th of March 1831, should " at all times be subject to amendment, alteration or repeal, at the pleasure of the legislature," with a proviso that no such act, containing an express limit of its duration, should be repealed, unless for some violation of the charter, or other default. This statute, first introduced into the general legislation of the Commonwealth by St. 1830, *c.* 81, and reënacted in the Rev. Sts. *c.* 44, § 23, and the Gen. Sts. *c.* 68, § 41, has been as much a part of ·all charters since granted as if inserted therein; and was manifestly adopted with the intention of reserving for the future a fuller parliamentary or legislative power than would otherwise be consistent with the effect to be allowed to the special terms of particular charters, under the judicial construction of the constitutional prohibition against impairing the obligation of contracts. The extent of the power reserved by such an enactment has been the subject of some diversity of judicial opinion, and a definition of its extreme limit is not necessary to this case. It is sufficient now to say that it is established by adudications which we cannot disregard, and the principles of which we fully approve, that it at least reserves to the legislature the authority to make any alteration or amendment in a charter granted subject to it, that will not defeat or substantially impair the object of the grant, or any rights which have vested under it, and that the legislature may deem necessary to secure either that object or other public or private rights.

Under such a clause, for instance, the legislature may make the stockholders of an incorporated bank liable for the future debts of the corporation. *Sherman* v. *Smith,* 1 Black, 587; *S. C. nom. In re Lee & Co.'s Bank,* 21 N. Y. 9. It may vary the measure, and thus enlarge the proportion, of the profits which a mutual life insurance company is required by the terms of its charter to pay to a charitable institution. *Massachusetts General Hospital* v. *State Assurance Co.* 4 Gray, 227. Railroad

corporations may be compelled, by general or special laws, to make changes in the level, grade and surface of the road-bed, new structures at crossings of other railroads or of highways, or station-houses at particular places, in a manner, and to be enforced by forms of process, different from those provided for or contemplated by the original charter, or the general laws in force when that charter was granted. *Roxbury* v. *Boston & Providence Railroad Co.* 6 Cush. 424. *Fitchburg Railroad Co.* v. *Grand Junction Railroad & Depot Co.* 4 Allen, 198. *Commonwealth* v. *Eastern Railroad Co.* 103 Mass. 254. *Albany Northern Railroad Co.* v. *Brownell,* 24 N. Y. 345; overruling *Miller* v. *New York & Erie Railroad Co.* 21 Barb. 513, cited for the defendants.

In the light of the principles thus established, we proceed to examine more particularly the provisions of the charter of the Hadley Falls Company.

The first section creates the corporation " for the purpose of constructing and maintaining a dam across the Connecticut River, and one or more locks or canals in connection with the said dam; and of creating a water power to be used by said corporation for manufacturing articles from cotton, wool, iron, wood and other materials, and to be sold or leased to other persons and corporations, to be used for manufacturing or mechanical purposes, and for the purposes of navigation;" and declares that it " shall have all the powers and privileges, and be subject to all the duties, liabilities and restrictions, set forth in the thirty-eighth and forty-fourth chapters of the Revised Statutes." The second section authorizes the corporation to hold real estate of a certain value, and limits the amount of its capital stock. The next two sections are as follows:

" SECTION 3: Said corporation is hereby authorized and empowered to construct and maintain a dam across said river at South Hadley, at any point between the present dam of the Proprietors of the Locks and Canals on Connecticut River and the lower locks of said proprietors, and of a height sufficient to raise the water to a point not exceeding the present level of the water above said last mentioned dam.

" SECTION 4. Said corporation shall pay such damages to the owners of the present fishing rights existing above the dam which the said company is herein empowered to construct, as may be awarded by the county commissioners of the counties in which said rights exist."

By section 5, " The Hadley Falls Company, or any of the owners of said fishing rights, may at any time apply to said county commissioners to proceed to ascertain and determine the damages to said fishing rights;" and on such application, the county commissioners, after public notice and hearing, " shall determine and award the damages to the said fishing rights, within sixty days from the application to them for that purpose; subject however to an appeal to a jury from such assessments, in the same manner, and with like proceedings, as in cases of assessments of damages by county commissioners for land taken for highways; and all expenses accruing under such application to and determination of the county commissioners shall be borne by the Hadley Falls Company."

By section 6, " for the purpose of reimbursing said corporation, in part, for the cost of keeping said locks and canals in repair, and tending the same," it is authorized, with the consent of the Proprietors of Locks and Canals on Connecticut River, to charge tolls on merchandise, boats and rafts.

No express authority is given by this charter to maintain a dam without a fishway. Its terms and provisions do not preclude the inference that the legislature contemplated the construction of a dam with a suitable passage for fish, so as not unnecessarily to impair the public right in that regard; and that, if the corporation should not make proper fishways, they might be compelled to do so by more specific legislation. The assessment of damages to fishing rights previously existing above the dam is quite as consistent with a partial interruption and injury of those rights, as with their utter destruction. The legislature may well have thought that a dam across the Connecticut River, with any kind of fishway which could be made, would to some extent interfere with the passage of fish, and injure the fishing rights above. But it is admitted that the dam,

as actually constructed and maintained, has utterly destroyed those fishing rights. No provision whatever is made for compensation for injuries caused, by the construction and maintenance of the dam, to fishing rights in the river below. The fact that the owners of such rights have not claimed such damages, or were not even aware of the injury done to them, affords no reason why the legislature, upon being satisfied, by larger knowledge or scientific investigation, that there are such rights, of value to the public, requiring protection, should not legislate accordingly.

The scope and effect of this statute, and the extent of the contract thereby made between the Commonwealth and the corporation, may be best seen and understood by comparing it with the legislation in the *Case of the Essex Company*, 13 Gray, 239, upon which the defendants principally rely to sustain their defence.

The original charter of the Essex Company, besides making it a corporation, and authorizing it to construct and maintain a dam across the Merrimack River, with provisions substantially corresponding to those contained in the first three sections of the charter of the Hadley Falls Company, expressly required the Essex Company to "make and maintain, in their dam so built by them across said river, suitable and reasonable fishways, to be kept open at such seasons as are necessary and usual for the passage of fish;" and provided that such fishways should be made to the satisfaction of the county commissioners. St. 1845, c. 163, §§ 5, 7. The Essex Company accordingly constructed the dam with a fishway to the satisfaction of the county commissioners. In 13 Gray, 250, the court guardedly abstained from expressing an opinion upon the question, "whether, if the fishways actually provided had proved wholly unfit and inadequate to their purpose, and other measures could be provided within a reasonable cost, which could be shown to be probably effectual, the legislature could, by further legislation, have required the company to construct such other fishways."

By the St. of 1848, c. 295, the Essex Company was authorized to increase its capital stock, upon the express condition tha

" said company shall be liable for all damages that shall be occasioned to the owners of fish rights, existing above the said company's dam, by the stopping or impeding the passing of fish up and down the Merrimack River by the said dam ; " that such damages should be assessed by the county commissioners, and, if either party should be dissatisfied with their assessment, by a jury ; and that nothing in the seventh section of the original charter should be deemed or taken as a bar to any claim for such damages. This act was made subject to acceptance by the corporation, and was duly accepted ; and in accordance with it large sums of money, amounting to more than twenty-five thousand dollars, were paid by the Essex Company to various owners of fish rights above the dam, as damages for hindering or impeding the passage of fish by the dam with such fishways.

In that case, the court, taking into consideration the facts, (offered to be proved by the corporation, and therefore regarded by the court as having the same bearing as if actually proved,) that, at the time of the passage of the second act, the dam had been in operation some time, with the fishway prescribed, and had proved to be unsuitable or insufficient to accomplish the proposed purpose of providing for the passage of the fish ; and also considering that the legislature, in passing it, acted both in behalf of the public and in behalf of all those riparian owners whose fish rights would be damnified by the defendants' dam ; held that that act, having been so passed by the legislature and accepted by the corporation, constituted a contract, which exempted the latter from the obligation of making and maintaining a suitable and sufficient fishway, and which had been executed on the part of the corporation by the payment of a large sum of money to the parties whose fish rights were injured, and was binding on the Commonwealth ; and therefore the legislature could not, either under the general power to protect and regulate the fisheries, or under the power to alter, amend and repeal charters, afterwards require the corporation to do the acts which, by the terms of the contract so made and performed, it had been exempted from doing.

In the *Case of the Essex Company*, the corporation had built a fishway in its dam, as required by the legislature, and to the satisfaction of the county commissioners, and had afterwards been granted an enlargement of its charter, upon the consideration that it should pay the damage caused to the owners of fishing rights by the dam as already built, with a fishway known to the legislature to be insufficient; it did not appear that any fishing rights below the dam were injured; and the court expressly assumed that the corporation had indemnified all parties damnified in their several fisheries; and, under those circumstances, held that the right to maintain the dam with the existing imperfect fishway had been paid for and had vested in the corporation, and that the contract between the Commonwealth and the corporation, thus executed, could not be afterwards impaired without violating the Constitution of the United States.

But in the case at bar, it not only appears that there are fishing rights below, which are injured by the dam, and for the injury to which no compensation has ever been made or provided; but no fishway whatever has been constructed; and the legislature has never, before passing the statute now sought to be enforced, exercised the power of defining what fishway the defendants should make; nor has it ever authorized or approved, by any expression or implication, the construction or maintenance of a dam without a fishway. In all these respects, this case differs from that of the Essex Company.

The other cases cited for the defendants are equally unavailing to support their position. In *Central Bridge* v. *Lowell*, 15 Gray, 106, the St. of 1843, *c.* 50, declaring that the sum of ten thousand dollars was a portion of the cost of the original bridge not yet reimbursed and repaid to the proprietors under their original charter, and, together with the expense of rebuilding the bridge, should constitute the capital stock of the bridge corporation, which it was held could not be afterwards repealed by the legislature, had been made subject to acceptance, and had been actually accepted, both by that corporation and by the city within whose limits the bridge was, and thus constituted a contract between the city and the bridge corporation; and it was

also in amendment of a charter which had been granted in 1824, and which therefore was not subject to alteration, amendment or repeal at the pleasure of the legislature.

In *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co.* 2 Gray, 1, the plaintiffs' charter, which was held to constitute a contract between them and the Commonwealth that no other railroad should be authorized to be made from Boston to Lowell, contained an express provision to that effect, and no reservation of power to the legislature, except to regulate the tolls, and was granted before the enactment of the general provision upon that subject in the St. of 1830, *c.* 81. So in *Commonwealth* v. *New Bedford Bridge*, 2 Gray, 339, the decision that a charter to build a toll bridge over navigable waters, with draws of a certain width, was unconstitutionally infringed upon by a statute requiring the corporation to make draws therein of a greater width, was put upon the grounds that the width of the draws had been expressly prescribed by the charter, that the bridge had been built accordingly, and that no power had been reserved in the charter, or by the general laws in force when it was granted, to alter, amend or repeal it.

The cases in which a railroad corporation has been held by this court to be entitled to recover compensation from another railroad corporation, authorized by subsequent statute to cross its track, were decided upon the ground that the legislature manifested no intention by the second charter to alter, amend or repeal the first, and on considerations similar to those upon which it had been previously held that a charter to construct a railroad was not to be presumed to authorize the taking either of lands or easements belonging to the Commonwealth, without compensation. *Commonwealth* v. *Boston & Maine Railroad*, 3 Cush. 107, 113. *Old Colony & Fall River Railroad Co.* v. *Plymouth*, 14 Gray, 155. *Grand Junction Railroad & Depot Co.* v. *County Commissioners*, Ib. 553.

The decisions of the supreme court of the United States in *McGee* v. *Mathis*, 4 Wallace, 143, and *Von Hoffman* v. *Quincy* Ib. 535, related to the power of taxation; and in each of them there was a specific clause of exemption or benefit in the orig-

inal legislative act, upon the faith of which contracts had been executed between the corporation and third persons. It is well settled by a series of decisions of the same court that a legislative exemption from taxation is not to be inferred without most explicit words. *Providence Bank* v. *Billings*, 4 Pet. 513, 524. *Philadelphia & Wilmington Railroad Co.* v. *Maryland*, 10 How. 376. *Christ Church* v. *Philadelphia*, 24 How. 300. *Thomson* v. *Pacific Railroad Co.* 9 Wallace, 579.

It only remains to consider the cases, cited for the defendants, which have arisen in the state of Connecticut.

In *Enfield Toll Bridge Co.* v. *Hartford & New Haven Railroad Co.* 17 Conn. 40, it was held that a charter granted by the legislature of Connecticut in 1798, to build and maintain a toll bridge for one hundred years, or until the expenses of its construction and maintenance should be reimbursed, with a proviso that no person or persons should have liberty to build another bridge within certain limits on the same river, constituted a contract, the obligation of which was impaired by granting to a railroad corporation the right to erect a bridge within those limits, to be used exclusively for railroad travel, and over which the railroad corporation should not permit any other passing. Upon that case it may be remarked, 1st. It does not appear that any power of altering or amending the original charter had been reserved by the legislature ; 2d. The charter of the bridge company contained an express stipulation that no other bridge should be authorized to be built at that place ; 3d. The judgment that the bridge or viaduct of a railroad corporation was such another bridge is in direct conflict with the recent decision of the supreme court of the United States in *Bridge Proprietors* v. *Hoboken Co.* 1 Wallace, 116.

In *Washington Bridge Co.* v. *State*, 18 Conn. 53, the original charter of the bridge company, which fixed the width of the draw in the bridge, and which was held to be violated by a subsequent act requiring them to make a draw of greater width, reserved a power of regulating the bridge and tolls to the legislature, only in the event, which had not come to pass, of the corporation having been reimbursed the moneys expended in

building the bridge, with interest thereon at the rate of twelve per cent. annually; and the intermediate act of the legislature, accepted by the corporation, which was held by the court not to affect the original provision as to the width of the draw and to leave those whose rights of navigation might be impaired to such remedies as the law had provided, relieved the corporation from some burdens, and made their grant exclusive for a certain distance upon the river, besides providing that nothing therein contained should be so construed as to impair the rights, privileges and immunities of persons using and navigating the river.

The case of *Hartford Bridge Co.* v. *East Hartford*, 16 Conn. 149, 17 Conn. 79, and 10 How. 511, upon which much stress was laid by the defendants, was as follows: In 1808, the general assembly of Connecticut passed an act, incorporating the Hartford Bridge Company, and authorizing it to build a bridge across the Connecticut River between the towns of Hartford and East Hartford, to the satisfaction of commissioners appointed by the assembly, and to take tolls thereon; and providing that " whenever the said tolls shall reimburse to said company the sums advanced by them in building said bridge, and the expense of lighting, maintaining and repairing said bridge, and of collecting the toll, with an interest of twelve per cent. per annum on the same, the said bridge and the rate of toll shall be subject to such regulations and orders as the general assembly shall think proper to make;" " that nothing in this grant shall now or at any future time in any way lessen, impair, injure or obstruct the right to keep up the ferries established by law between the towns of Hartford and East Hartford;" " and also that the grant may receive such alterations from time to time by the general assembly as experience may evince to be necessary or expedient." The bridge company accepted this charter, and built the bridge to the satisfaction of the commissioners. In 1818, the bridge having been carried away by a flood, the legislature passed an act providing that when it should have been rebuilt by the corporation to the satisfaction of the same commissioners, the ferries before mentioned (the privilege of keeping one half of which had been in 1783, by

the act separating East Hartford from Hartford, granted to East Hartford "during the pleasure of the assembly") should be discontinued; and the bridge was rebuilt accordingly. The general assembly by subsequent acts declared so much of the act of 1818 as provided for the discontinuance of the ferries to be repealed. The supreme court of Connecticut held that the act of 1818 was constitutional and valid as against the town of East Hartford; but, by a majority of the court, that the acts which undertook to repeal so much of that act as discontinued the ferries were unconstitutional and void, as impairing the obligation of the contract between the state and the bridge corporation, contained in the act of 1818; and that the act of 1808, upon a comparison of all its provisions, restrained the legislature from making any regulations materially affecting the prescribed revenues of the corporation until it should have been reimbursed as therein provided. Upon a writ of error sued out by the town of East Hartford, the supreme court of the United States affirmed the judgment, upon the ground that the decision in favor of the validity of the act of 1818 was correct, and that the decision against the validity of the subsequent legislation could not be revised by that court. The whole result of the case is, that the only point decided by the supreme court of the United States upon the validity of either of the acts of the legislature of Connecticut was, that an act discontinuing a ferry which had been granted during the pleasure of the legislature was valid; and the decision of the majority of the state court against the validity of the acts which undertook to revive the ferry was based upon the peculiar language of the charter of the bridge company.

The chief justice of Connecticut, in delivering the first opinion in that case, assumed that if the legislature had manifested an intention to reserve an unlimited control over the charter, by using the language ordinarily employed in reserving such a power — "This act may at any time be altered, amended or repealed by the general assembly" — the conclusion of the court must have been different. 16 Conn. 176. And in *English* v. *New Haven & Northampton Co* 32 Conn. 240, which is later

than any of the cases in that state cited for the defendants, the court held that when the legislature had reserved a general power of altering, amending or repealing a charter, it might impose any additional condition or burden, connected with the grant, which it might deem necessary for the welfare of the public, and which it might originally and with justice have imposed.

Upon the whole case, taking into consideration the terms of the charter of the Hadley Falls Company, and the power of alteration, amendment and repeal previously reserved to the legislature by the public statutes of the Commonwealth, we are unanimously of opinion that the legislature has not surrendered or restricted its inherent power of regulating and protecting the fisheries on the Connecticut River, and, in so doing, of providing for the maintenance of a suitable fishway in the dam erected by that corporation; and that the recent legislation compelling the making of such a fishway does not impair the obligation of any contract of that corporation or its assigns with the Commonwealth or any other party. *Decree for the plaintiffs.*

*C. Allen,* Attorney General, & *M. Williams, Jr.,* for the plaintiffs.

*W. Gaston,* and *F. Chamberlin,* (of Connecticut,) for the defendants.