Spear, J.
(dissenting). The proposition is that the city of Hamilton may build and operate gas works in opposition to, and in competition with, the Hamilton Gas Company. Authority for this action is claimed to exist in sec. 2486, Revised Statutes, enacted May 7, 1869, which is quoted in the majority opinion. I respectfully submit that the section, properly construed, gives no authority for such action. In other words, that sec. 2486 does not apply to this case, but gives to municipalities power to erect gas works only where none exist.
I concede that the letter of the section appears to give councils power, whenever deemed expedient and for the public good, to erect gas works. But we should try to get at the meaning of the "whole statute upon the subject, and not be content to determine the rights of the parties by a strict construction of one clause only. The subject matter should be considered, and we should endeavor to reach the intent of the law-makers. Disregarding these considerations, and reading according to the mere letter, would lead to false and unjust results, while if we regard the subject matter, the purpose and object, and the way in which parties whose interests are to be controlled by the law will be affected by the several parts, we may hope to reach rational, just and satisfactory results.
The law as to municipal control of the subject of gas supply is.contained in Revised Statutes, secs. 2478 to 2491, inclusive, and to get at the meaning and purpose of the legislature it is necessary to consider the sections as a whole. The controlling provisions are sufficiently set out in what precedes and follows, and need not be quoted anew. A *77 reading of them shows that the object to be accomplished was to afford means by which municipal corporations might be supplied with gas; and, having in mind that general policy of the state, which has long obtained, to confine the powers of municipalities to matters which relate to the control of public interests, leaving to private enterprise the supplying of public needs where the same can be better and more economically managed by private agencies,, though under the supervision of public officers, it seems rational to say that this statute, taken as a whole, contemplates the furnishing of gas by private parties or corporations, under the control of municipal councils; and that the municipality may itself perform that office only in case of failure by such party or corporation, or in case there is not such agency present equipped to perform the service. This view is apparent when we note with what care the contingencies upon which the municipality may itself erect works are pointed out in secs. 2480 and 2482, and observe the modifying provision of sec. 2481, which gives the council, after the default mentioned in the preceding section, authority to permit the company to use and occupy the streets, and of sec. 2488, which provides that a temporary failure to furnish gas shall not operate as a forfeiture, unless it were through the failure or misconduct of the company. It is strengthened, too, by the words of .the last clause of 2486, “ or to purchase any gas works, already erected therein.” That is, where gas works have been erected, the council may buy, and where none have been, there council may erect works at the expense of the corporation. If power to erect where there are already works erected is implied by the language of the first clause, why add the words “ already erected therein,” to the last clause ? Surely, they would be superfluous.
This construction makes the whole statute consistent, gives effect to every word, clause and provision of the entire law, and negatives any idea that it was the legislative purpose to authorize a municipality to erect and operate works in competition with a company therein duly established; while to give to section 2486 the construction claimed for it by the *78 city, renders wholly nugatory and meaningless sections 2480, and 2482; for what possible object would there be in providing as is there enacted, that the right to «establish works by the city should depend upon the failure of the company to lay mains where directed, or furnish gas at prices fixed by council, if, under the same circumstances, the city had a like Ught whether the company so failed or not ? Besides, under a well known rule of construction, the general provision of section 2486 must give way to the special provisions of sections 2480 and 2482. Again, if section 2486 is to receive the construction claimed by the city, the effect is to repeal, by implication, sections 2480 and 2482. Repeals by implication are not favored.
It is true that section 2486 is later in local position, and in a sense, later in date of enactment than 2480 and 2482, and much is claimed for this. To me these facts seem entirely without practical value. Section 2486 first appeared in the municipal code, numbered there section 423. The act was entitled “ an act to provide for the organization and government of municipal corporations.” It repealed, with many other acts, that part of the act relating to municipal control of gas supply which embodied sections 2480 and 2482, and, to all intents and purposes, took the place, as a symmetrical whole, of all previous legislation upon the subject. Now, as the statute so enacted purported to contain a full expression of the legislative will, and to be treated as though enacted simultaneously, how can there be any first, or middle, or last ? To the rule even as claimed by the city there are modifications and exceptions. “Nor, as a statute is to be construed with reference to other statutes, in pari materia as well as by a survey of the whole context, and as the various provisions are to be made to stand together, if possible, will such be the result, where, upon a comparison of the entire act with others upon the same subject, there appearing no intention to change the general scheme or system of legislation upon the same, the earlier provision harmonizes, and the latter conflicts with suoh statute. And it has been seen that a reading of the provisions of the whole statute together, may give to earlier sec *79 tions the effect of restricting the meaning of later ones, as well as to the latter the effect of restricting the operations of the former.” . Endlich, sec. 183. “ The intention of the law maker is to be deduced from a view of the whole, and every part of the enactment, taken and compared together. He must be presumed to have intended to be consistent with himself throughout, and at the same time to have intended-effect to be given to each and every part of the law; and from this it results that general language found in one part, is to be modified and restricted in its application, when it would otherwise conflict with specific provisions found in another.” State v. Blake, 2 Ohio St. 147; See, also, Allen v. Parish, 3 Ohio, 187; Pancoast v. Ruffin, 1 Ohio, 381; Hirn v. The State, 1 Ohio St. 15, and State v. Commissioners, 20 Ohio St. 421.
But the section will not bear the construction claimed for it by the city for other reasons. This company was organized in 1855, under the act of May 1,1852, “ to create and regulate gas-light and water companies.” Its purpose was to manufacture gas and furnish it for lighting the streets, and public and private buildings in the city of Hamilton. This was a public purpose. Its accomplishment would benefit the city by enabling it to more effectually protect persons and property therein. In accepting the provisions of the laws then in force, the company, in consideration of the privilege granted, undertook to supply a public want. This duty it cannot avoid or shirk. Neglect of it, as we will presently see, would subject it to severe loss and possible deprivation of corporate existence. To avail itself of the rights and privileges conferred, and to enable it to perform the duty imposed, the company, under the authority and direction of the city of Hamilton, expended large sums of money in the construction of works and the laying of mains in the streets of the city, and the furnishing of facilities for the supply of gas to the city and its people, taking upon itself whatever risk of return upon the capital thus invested there might be in the venture. It undertook this work and assumed this risk in view of the law regarding gas companies, and the power of municipal *80 corporations over them. The act referred to authorized the incorporation of such companies for the “ purpose of supplying gas to light the streets and public and private buildings of the city,” etc., the purpose to be specified in the certificate of incorporation, and when incorporated, the companies “ were authorized to cany on the operations named in the certificate,” without limitation as to time. They were to “have full power to manufacture and sell gas and.furnish such quantities of gas as may be required in the city.....for public or private buildings, or for other purposes.” And, in order to accomplish this, were given power to lay conductors for conducting gas through the streets, etc., with the consent of the municipal authorities. Amendments to the act gave to municipal corporations the power to regulate the price at which gas companies should furnish gas to the city and to private consumers, to fix the price for rent of meters, and to require them to lay pipes and light such streets as the council might direct. On failure to extend pipes as directed, the city could erect works and lay pipes for the supply of such streets, and other streets not lighted. A neglect of the company to furnish gas to the citizens, or other consumers of gas in accordance with prices fixed by the council, would forfeit all its rights, and the city could then erect, or authorize any person to erect, works, and supply gas to the city and private consumers. Such, in brief, were the provisions of law on the subject at the time of the incorporation of this company. Under this law, so long as a company complied with every lawful requirement to the public and to private consumers, the public object of the statute was accomplished; and, if the construction I contend for be correct, the right of the company to furnish gas to the city and to private consumers therein, remained unimpaired, and the city had no power to interfere with the company’s chartered rights by entering into competition with the company while carrying out the purpose of its organization. It is not pretended that this company has, in any respect, failed in the performance of any lawful requirement.
It will be borne in mind that the city is but an agency *81 created by the state for the more effectual carrying out of its governmental purposes. The city has such power, and such only, as is clearly given by the state, and, under the statute, the only discretion it had in the first instance was to give or withhold its consent to the use of its streets and grounds, and, having exercised that in favor of the company, and the company having acted on that consent, its further power was simply to regulate, within reasonable discretion, the company in its operations conformably to the statute. If it has now power to do more than this, it( is because of new authority derived from the state. So that, the question at issue here is, in reality, between the gas company and the state.
In effect the statute gave to this company the exclusive right, so long as it complied with every requirement of law, to supply gas to the city of Hamilton and its inhabitants. This right was upon condition of performance of the required service by the company, an object beneficial to the community, and was a grant of a franchise vested in the state. Based as it was upon abundant consideration, and there being competent parties and a lawful subject matter, the transaction was, in all essential particulars, a contract between the state and the company, and if, as I claim, and think can be maintained, there was granted an exclusive right, any taking back by the state in the manner proposed would be a violation of that contract, and would result in the taking of private property without compensation. The extent to which such contract may be changed under the constitutional power to alter or repeal will be considered further on.
By the act referred to, the general assembly did not part with the police power and duty of protecting the public health, the public morals, and the public safety, and hence such contract was not in excess of the power of that body. New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650; Louisville Gas Co. v. Citizens' Gas Co., ibid. 683.
But it is insisted that the franchise of the company is a mere license; that the company took it subject to the power *82 of the state, at any time, without regard, to the question of performance of duty by the company, to vary it by a new law, or, indeed to destroy it altogether. In other words, the position of the city is that the state has the right at any time to abandon the obligation it incurs where it creates a corporation for the express purpose of performing a public service, and, by a change in the law, it can itself do, by its agent the city, the very thing it created the corporation to do, without making compensation for the material property, necessary to its business, which the company has acquired. This claim is grounded on sec. 2, of article 13, of the constitution. That section reads: “Corporations may be formed under general laws, but all such laws may, from time to time, be altered or repealed.” This section should not be looked at alone, but in connection with other sections of the same instrument. The inviolability of contracts secured by sec. 28, of article 2, which provides that “ the general assembly shall have no power to pass.....laws impairing the obligation of contracts,” and the protection thrown around private property by sec. 19, article 1, which ordains that “ private property shall ever be held inviolate, but subservient to the public welfare ”.....and when taken for public use in time of peace “a compensation therefor shall first be made in money,” afford considerations just as binding upon the public conscience — and which, I submit, ought to be just as binding on the conscience of courts — as the injunctions contained in the section first quoted; and if the effect of a proposed alteration or repeal is to violate a contract between the state and some of its citizens, in such way as to result in the taking of private property without compensation, then such change cannot be made without violation of the clauses last quoted. If, therefore, in the given instancé, a contract has been made which it would be a violation of sec. 28 to repudiate, the power given by sec. 2, article 13, must be construed to be a power to control and regulate, not a power to destroy and confiscate. The repeal provided for by article 13, looks to a repeal of the charter; that has not been attempted by the enactment of sec. 2486. The corporation, as *83 such, under either construction of that section, still survives. And while, if the construction claimed by the city is correct, the effect would be the equivalent of a repeal of the charter, no such purpose appears in that section; which affords additional ground for rejecting that construction. The state cannot, by right, more than can an individual, repudiate its contracts without making the other party whole. That alterations, in a ease like the present, may go only to the manner of exercising the power conferred, is sustained by abundant authority. Hyatt v. McMahan, 25 Barb. 457; 2 Morawetz, sec. 1095, and following. “The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be made in good faith, and be consistent with the object and scope of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment and alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations, in sueh cases, are surrounded by the same sanctions and are as inviolate as in other eases.” Shields v. Ohio, 5 Otto, 325. “ That this power has a limit no one can dispute. All agree that it cannot be used to take away property already acquired under the operation of the charter, or deprive the corporation of the fruits actually reduced to possession, of contracts lawfully made.” Chief Justice Waite, in Sinking Fund Cases, 9 Otto, 700. To like effect are the decisions of the Supreme Court of Massachusetts, where a statute embodies substantially the provision of sec. 2, of article 13, of our constitution. In Commonwealth v. Essex Co., 13 Gray, 239, the court says: “The Essex Co., having made and maintained a fishway in the dam across the Merrimac river, to the satisfaction of the county commissioners, as required by their charter, and having duly accepted the act authorizing them to increase their capital stock on condition that they should be liable for all damages occasioned by their dam to the owners of fish rights above it, and having paid large sums of money for such damages, cannot afterward be required by the legislature, in the exercise of their power to regulate fisheries, to make different fishways, notwithstanding *84 the Rev. Stats., c. 44, § 28, reserving to the legislature the right to amend, alter or repeal charters.” And Chief Justice Shaw, in the opinion, says: “ The power of repeal is limited and qualified, and was so considered in the case of Crease v. Babcock, 23 Pick. 334.....Where, under power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted.” In Commissioners v. Holyoke Co., 104 Mass. 446, the holding is: “The provision of the Rev. Stats., c. 44, § 23, and Gen. Stats., c. 68, s. 41, declaring that acts of incorporation shall be subject to amendment, alteration or repeal at the pleasure of the legislature, reserves to the legislature the authority to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant or any rights vested under it, and which the legislature may deem necessary to secure either that object or other public or private rights.” This language is quoted with approval by Morton, J., In Parker v. Railroad, 109 Mass. 506, and there is no doubt that it is the settled doctrine of that state upon the subject, nor that the decisions cited from the reports of the Supreme Court of the United States settle the same rule for that court. The law has not been settled otherwise in this state, and it is respectfully submitted that the present case affords a good opportunity to settle it right.
Had the general law of the state in force when the gas company was organized been incorporated in a special charter, it could not have formed a more essential part of the contract, or clothed the company with greater powers. While the act of May 1, 1852, does not, in terms, give an exclusive right to the company, yet if such right is necessary in order to fully accomplish the object of the statute, the result is the same. The right to furnish gas thus vested in the company was an exclusive right because, so long as the company complied with the law in the full performance of its duty, it had the right to furnish all gas required. “ Full *85 power.....to manufacture and sell, and to furnish such quantities of gas-.....as may be required in the city,” is the language of the grant. This implied that neither the city, nor any person or corporation deriving its powers from the state, could have a like right, for it would be impossible for the two rights to exist together. It is not more impossible, in physics, for two bodies to occupy the same space at the same time than it would be for two distinct organizations to occupy the streets of Hamilton in a way to furnish gas to the city, and to furnish the city and its people all the gas that might be required. If one did the other could not.
As to the purpose of the city in the erection of the contemplated works, it may not be of the first importance to determine whether it is intended to furnish gas for private consumption or not. The company alleges that such is the purpose. The response is that no action has been taken towards furnishing gas for private consumption; but the defendant cannot say what action, if any, the city will in the future take. This falls short of a disclaimer of the intent charged, and when it is remembered that, by an almost unanimous vote of the electors, the scheme of building works was approved, it needs no prophetic vision to see that, if private consumers can exercise choice, so soon as the city, is disposed to furnish gas to them, the demand upon the company- for gas from all sources will practically cease. Sb .that the proposition that the contracting and operating qf gas works by the city, would work practical confiscation of the property of the gas company seems clear. With the power to fix the price at which the company must furnish gas, and the power to fix its own price for that manufactured by itself, whatever might be the wish of private consumers, self interest would determine their choice, and real competition would be impossible. Such competition would not only prevent the company from further receiving benefit under its franchise, but would practically destroy the value of its property. Though not an actual physical taking of the property, there would be such practical destruction of the common and necessary use, as would be equivalent to a taking, and this *86 would be “ a taking ” within the meaning of sec. 19, art. 2, supra, and within the meaning of the Federal Constitution. Pumpelly v. Green Bay Co., 18 Wall. 166.
The construction of the statute claimed by the city is not reasonable. It shocks the moral sense. To admit that the legislature, after having, by laws enacted prior to the organization of this company, held out to gas companies an inducement to invest large amounts of money in works and pipes for the purpose of establishing their business of furnishing “such quantities of gas as may be required,” would, when the expenditure had been made on the faith of the power granted, by an amendment, give to municipal corporations the power to embark in the same business, to supply the same want, and thus place the property of gas companies wholly within the control of municipalities, acting on the caprice of city councils, or the impulsive vote of the people, is to presume a lack of good faith in matters of state which would be dishonorable between individuals. A statute ought not to receive a construction warranting such a conclusion, unless its terms are so direct and unambiguous as to admit of no other construction; and if, to give the construction contended for, would result in an interference with vested private rights, and cause the state to legislate back to-itself, the franchises, rights and privileges, which it had created, and thus destroy the corporeal property of the corporation without compensation, then such construction is not permissible, because it drives us to the conclusion that the statute is unconstitutional. Sinking Fund Cases, 99 U. S. 718. “A statute should ’ not receive a construction which makes it conflict with the constitution, if a different interpretation is practicable.” Burt v. Rattle, 31 Ohio St. 116.
It seems to be feared that this gas company cannot be accorded the right given it by the statute under which it was organized to furnish the gas that may be required in the city of Hamilton, because to do so would be a violation of the clause of the constitution (sec. 2, Art. I.), which forbids the legislature to grant special privileges that may not be altered, revoked, or repealed, and because there would thus be created *87 a monopoly. If this is seriously urged the answer to it is, that no special privilege or immunity is created because all citizens in Ohio had equal right, under the law, to organize a corporation for the purpose of doing what, in the nature of things, only one organization could do, namely, supply the need of the city of Hamilton for gas, and no monopoly, in any objectionable sense, was or could be created, because the company was absolutely within the control of the city as to the price of its commodity, and, in all essential particulars, in the conduct of its business with the public. It is not wise to be too easily disturbed by the cry of “ special privileges,” and “ monopoly.” Those terms became odious from the fact that in England, by law, or by royal prerogative, letters patent to particular individuals, were granted to conduct certain lines of business, or trade in certain commodities, to the exclusion of all others,, which resulted in the restriction of production, the impairment of the quality of the article produced, the enhancement of prices, and the enrichment of the few and impoverishment of the many, and it was to forever prevent such enactments that the section of the constitution referred to was ordained. B ut no such result, in either aspect, could possibly ensue in the case we are considering, and hence no valid objection on the ground urged, exists. On the other hand the business of this company was a business of a public character, at least so far as supplying the needs of the city was concerned. It was a want which the state might, directly, or through a proper agency, supply by contract. In principle the case is not essentially different from that where the state lets to a bidder, where but one appears, the right to erect some public work. The advantage, if any results, may extend over a longer time, and it may not; but however ■ that may be, all citizens, having the means, have an equal right and opportunity to avail themselves of the advantage. In this case the state held out the inducement to all citizens to organize for the purpose of supplying a public want of municipal communities. The incorporators of the Hamilton Gas Company accepted the state’s proposition as regards the city of Hamilton. No other citizens did accept *88 it. The company then went forward, and, in all respects, performed the duty, complied with the law as it then was, and with all amendments as to its proper regulation which have since been enacted. With what grace can the state now say to it you must withdraw, and leave to another agency the performance of the duty we entrusted to you, and lose the value of the property you have acquired in performing that duty, property which, from its nature, can neither be removed nor profitably applied to any other purpose? And, from a moral standpoint, as well might the state, after it had contracted with a citizen to erect a public building, and after he had procured his material, constructed his machinery,, and employed his labor, ignore its contract, purchase its own material, construct its own machinery, and proceed with the public work.
Attention is called to the statute, sec. 2485, which forbids councils to agree with any person or company to give or continue the exclusive privilege of using the streets, etc., for the purpose of conveying gas. The bearing of the section upon the question is not perceived, but if it has application, in principle, it is enough to say that no such provision existed at the time of the organization of the Hamilton Gas Company.
The decision in State v. Cincinnati Gas Co., cited in the majority opinion, would seem not to have close application to the case at bar. That was upon a question of tire power of a municipal corporation to grant an exclusive right to a gas company; this case raises the question whether the state can grant such right, and if so, whether after the right has been granted, it can be taken away to the destruction of the company’s plant? Turnpike Co. v. The State, 3 Wall. 210, is also cited. The cases are hardly parallel. Had the Maryland legislature undertaken to-authorize another turnpike company to build and operate a turnpike over the same road, with authority to fix the tolls to be charged by the rival company, there would have been a question similar to the one here being considered. The other cases cited in the majority opinion, as to the question of vested rights, will be *89 found of like import, and it is respectfully submitted that the holdings do not sustain the city’s claim. The controversies arose between companies supplying similar wants but in a wholly different way, and occupying different ground. Ours is a case of the state itself proposing, against a. company, to supply the identical public want, by the identical means, and upon the same ground. In Shields v. The State the power exercised was one of regulation. No one' has claimed that this may not be done. The Hamilton Gas Company is not resisting regulation.
Nor would a judgment of ouster work injustice to the city, for before the expenditure of any money or the incurring of any obligation on the part of the city, it was duly notified of the claims of the company, and that legal action would be taken to enforce them.
It is not assumed that there is any vested right in the gas company to light the city of Hamilton. It was to furnish what gas might he required. So that, when gas is not longer required the right ceases. The city may return to oil or gasoline, or adopt some newer agency, as electricity, and the people may refuse to burn gas; and of this the gas company cannot complain, because its rights are not invaded. That a time might come when gas would not be required, was one of the risks the company assumed. But so long as the streets, public grounds and buildings of the city are to be lighted with gas, the l ight of this gas company to do that lighting, it seems to me, cannot be lawfully denied. Of course it is subject to the control of the city in all the particulars specified in the statute under which it was organized, and in later statutes relating to regulation. Under such authority the power of the city to regulate is ample. This regulation, however, is confined to the carrying out of the purpose for which the company was organized. While it may regulate, it may not destroy.
The contention of the city shocks the sentiment of common justice. It is opposed to the general policy of the national government, as shown by the decisions of its highest court, and the action of its executive officers, and to that *90 of our own state. An instance is referred to by counsel. Turnpike companies and plank-road companies were authorized by statute, and many toll-roads were built in various parts of the state, with right to take toll from all travelers. When the state sought to resume the power granted, provision was made by statute (sec. 8086 Revised Statutes) by which the companies should be paid for their property, and commissioners of counties, where these roads were located, were authorized' and required to purchase the property of suuh companies within the county, and to issue bonds for the payment of the same. Under this act, as is stated, Butler county alone has paid over forty thousand dollars. In its action in this matter the state has been governed by the plainest principle of justice and fair dealing. The same principle applied to 'the affairs of the city of Hamilton and the gas company would require that, if the city desires to engage in the gas business, it should undertake to avail itself of the power given in sec. 2486, and endeavor to buy the works already in operation there.