HOWARD SWIFT & others *vs.* INHABITANTS OF FALMOUTH.

Barnstable.     January 20, 1896. — October 28, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, LATHROP, & BARKER, JJ.

*Town — Validity of Contract — Fishery — Statute.*

The St. 1797, c. 74, authorized a town to cause the natural course of the streams therein through which alewives passed to be kept open and unobstructed, and to open or cause to be opened a sluiceway through any dam then or thereafter to be erected thereon, for a passageway for the fish during a limited time in each year. This statute was repealed by St. 1847, c. 94, which authorized the town to prescribe the times, places, and manner of taking alewives in the waters therein, and to adopt such further rules as might be deemed expedient for the preservation of such fishery. In 1842 the town opened a passageway from a great pond into a natural stream which flowed into a private pond upon which was a mill; and in 1846 the town executed an agreement with the mill owner, which contained a covenant that the town would at all times during the year "keep open a watercourse" between the ponds. Several dams were afterwards built above the mill by the owners of cranberry bogs, which interfered with the mill owner's use of the waters. In 1894, the town appointed a committee which made an agreement with the mill owner's successor for certain

modifications of the agreement of 1846. *Held,* upon a bill in equity to enforce specific performance of the covenant, that, if it was to be construed as an absolute agreement to keep the waters between the two ponds free from all obstruction, the town exceeded its authority under the statute; and that if the effect of the agreement of 1894 was to ratify the covenant, the town had no authority to make it under the laws then in force.

BILL IN EQUITY, to enforce specific performance of a covenant in an agreement. Hearing before *Holmes,* J., who, at the request of the parties, reported the case for the consideration of the full court; such decree to be entered as equity might require. The facts appear in the opinion.

*G. P. Wardner,* for the defendant.

*R. M. Morse,* (*M. Morton* with him,) for the plaintiffs.

LATHROP, J. The plaintiffs seek by this bill in equity to compel the defendant to cause the waters of Coonamesset Pond to flow freely into Parker's Pond. Coonamesset Pond is a great pond, and, so far as the report upon which the case comes before us shows, had no outlet; but in 1842 a passageway, called Dutchman's Ditch, was built by the defendant, connecting the waters of this pond with a natural stream called Dexter's River, which flowed into Parker's Pond, and thence into Factory Pond. Both of the last named ponds are owned by the plaintiffs, and in 1846 were owned by the predecessors in title of the plaintiffs. In 1842 the town acquired title to a part, and in 1846 to the rest, of the land on each side of Dutchman's Ditch. Dexter's River, after leaving Parker's Pond, flows into Vineyard Sound, or the sea.

In 1846, the plaintiffs' predecessors in title had a mill, called the Pacific Woollen Mills, at the foot of Factory Pond, and there was a flume at the highway which crossed the stream between Parker's Pond and Factory Pond. The mill was taken down more than twenty years ago. Later, a shoddy factory was built there, which still stands, but is not now used as a factory. Parker's Pond and Factory Pond are now cranberry bogs, and for six months of the year the water is off, except within the limits of a stream flowing through the bog. The mill is still used by the plaintiffs a little, however, in their business.

On February 27, 1846, an agreement under seal was entered into between three persons, describing themselves as agents of the town of Falmouth, and as being duly authorized by a vote

of that town, of the first part, and other persons named, described as the owners of the Pacific Woollen Factory, of the second part. The agreement was declared "to be perpetually binding on said town and the owners of said factory forever." By the agreement, the town acquired a right to make a way across the dam of the mill owners for herring to pass from the sea into the pond above the dam, and also across the dam into Parker's Pond. The town also acquired a right to erect a house on the land of the mill owners, near the place where the herring were to be taken.

The covenant which the plaintiffs seek to enforce in this case is that contained in article third of the agreement, which reads as follows: "The party of the first part, in consideration of the premises, shall at all times during each and every year keep open a watercourse between Coonamesset Pond and Parker's Pond, so that the waters of Coonamesset Pond shall run into Parker's Pond freely, except in seasons of unusual drought; and at all such times the party of the second part may widen or deepen (at their own expense) the ditch called Dutchman's Ditch, so as to supply their factory or factories with necessary water, through Dutchman's Ditch; it being always understood that the party of the second part are not to do any act in relation to Dutchman's Ditch which shall prevent the ingress or egress of the herring into and out of said Coonamesset Pond, through Dutchman's Ditch."

The obstructions complained of are six dams built of late years, but precisely when does not appear, above Parker's Pond, on Dexter's River, by the owners of cranberry bogs, acting under the Pub. Sts. c. 190, § 48. This act reads as follows: "Any owner or lessee of land appropriated to the cultivation and growth of the cranberry may erect and maintain a dam upon and across a stream not navigable, for the purpose of flowing and irrigating said land, upon the terms and conditions and subject to the regulations contained in this chapter [the Mill Act], so far as the same are properly applicable in such cases." The provision for compensation for injury thereby caused is found in § 4 of the same chapter. See *Hinckley* v. *Nickerson*, 117 Mass. 213; *Howes* v. *Grush*, 131 Mass. 207. This act was first enacted by the St. of 1866, c. 206, § 1.

There is no contention that the six dams were not legally built, and there is nothing to show that they were not furnished with proper sluiceways for the passage of fish.

The report finds: "There was no obstruction to the flow of the water in Dutchman's Ditch. All of the dams that obstruct the flow of the water have been located on the stream below where Dutchman's Ditch empties into said stream."

The report also finds that these dams interfere appreciably with the plaintiffs' use of the water, sometimes keeping it back for forty-eight hours; and that the purpose for which the plaintiffs really want the use of the water is for their cranberry bogs.

At a town meeting held in Falmouth in 1892, a committee of three was appointed to confer with the owners of the property formerly owned by the Pacific Woollen Factory, " to take all needed measures to permanently locate and provide a suitable way for the herrings to pass up and down through said property in their season, and also to locate and provide one or more suitable places for the taking of herrings on said way." Whether any action was taken by this committee does not appear, but in March, 1894, another committee of three was appointed " to carry into effect the vote passed at the annual meeting in 1892, in relation to the above named herring river."

On August 1, 1894, the last named committee, purporting to act for the town, entered into an agreement with the plaintiffs, describing them as " the present owners of the land and premises formerly belonging to the Pacific Woollen Factory," whereby certain modifications of the agreement of 1846 were made. These modifications are immaterial to the present controversy. The purpose of putting in the agreement is to show, as the plaintiffs contend, that the town in 1894 ratified and confirmed the agreement of 1846, although there was no ratification or confirmation, unless implied in the fact that the former agreement was modified.

The first question arises as to the construction of the covenant contained in article 3 of the agreement of 1846. The only specific authority which the defendant or its agents then had to act in the matter was under the St. of 1797, c. 74, § 1, passed March 2, 1798, and entitled " An Act to prevent the destruction and to

regulate the catching of the fish called alewives in the rivers and streams in the town of Falmouth." This statute empowered and directed the town, at its meeting for the choice of town officers in March or April annually, to choose five or more persons as a committee to see that the act be duly observed. This committee was authorized and empowered " to cause the natural course of the streams through which the said fish pass to be kept open and without obstruction, to remove any such as may be found therein," and the act declared that they " shall have authority for those purposes to go on the land or meadow of any person through which such streams run, without being considered as trespassers; and shall open or cause to be opened any sluiceway through any dam now erected, or that may be hereafter erected on or over any of the said rivers or streams, (between the ponds where said fish usually cast their spawns and the sea,) at the expense of the said town of Falmouth: Provided, the owner or owners of any such dam shall neglect to open the same when thereto required by the said committee. And the dam or sluice so opened shall continue open in every year to such depth and width as shall be necessary for a passageway for said fish ; and for such term of time, between the first day of April and the tenth day of June, as the major part of the said committee shall judge necessary."

While the statute gave the town committee the power to cause the natural course of the streams to be kept open and free from obstructions, it did not authorize the removal of any dam, but only gave authority to the committee to open or cause to be opened a sluiceway through any dam then erected, or that might thereafter be erected, for a passageway for the fish, and this only for a limited time in each year.

The legislation, from early times, has recognized the rights of the owners of dams upon streams, and also the right of the public to have the fish run freely up natural streams during the spawning time, and to return to the sea. In the earliest statute on this subject, providing for the removal of obstructions to the free passage of fish, it is especially provided " that nothing herein contained shall be construed to extend to the pulling down or demolishing of any milldam already made, or that shall hereafter be lawfully and orderly made." Prov. Sts. 1709–10,

c. 7, 1 Prov. Laws, (State ed.) 644. . The first provision as to a sluiceway in a dam is found in the Prov. Sts. 1735–6, c. 21, 2 Prov. Laws, (State ed.) 786. Section 1 provides : " That no dam shall, hereafter, be erected across any river or stream thro' which alewives or other fish have been accustomed to pass into ponds, in which there is not made and left a convenient sluice or passage for such fish, on penalty that the owner or owners of such dam shall, upon conviction of failure or neglect therein, before any court proper to try the same, forfeit and pay the sum of fifty pounds." See also Prov. Sts. 1741–2, c. 16, 2 Prov. Laws, (State ed.) 1087 ; 1743–4, c. 26, 3 Prov. Laws, (State ed.) 133 ; 1745–6, c. 20, 3 Prov. Laws, (State ed.) 267 ; 1754–5, c. 31, 3 Prov. Laws, (State ed.) 809 ; 1764–5, c. 34, 4 Prov. Laws, (State ed.) 774.

It has become the established law of the State, that every owner of a dam across a stream where migratory fish are accustomed to pass is obliged to provide a sufficient and reasonable way for the fish, unless he is exempt by express provision or obvious implication in his grant. *Stoughton* v. *Baker,* 4 Mass. 522. *Commonwealth* v. *Chapin,* 5 Pick. 199. *Vinton* v. *Welsh,* 9 Pick. 87. *Commonwealth* v. *Alger,* 7 Cush. 53, 98–101. *Commonwealth* v. *Essex Co.* 13 Gray, 239, 247–250. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 450.

The situation of the parties at the time the agreement of 1846 was made was this. The town, apparently without any authority, had opened a passageway from a great pond into a natural stream. Between this point and the land owned by the woollen company was land owned by third persons, on which dams were liable to be built. So long as no dam was built the committee had authority, under the St. of 1797, to keep open and unobstructed the natural course of the streams through which the fish passed, but if a dam should be built the only authority of the committee was to open or cause to be opened a sluiceway in the dam. When, then, the committee covenanted to " keep open a watercourse " between two ponds, it would seem that the meaning was to do no more than was authorized by the statute.

If, however, we assume that the covenant in the agreement of 1846 is to be construed as an absolute agreement to keep the

waters between the two ponds clear and free from all obstruction, then it is obvious from what has already been said that the committee exceeded its authority, and did what it had no right to do under the statute.

That a contract made by a town or its agents in excess of its corporate powers is invalid is settled by many cases, of which only a few need be cited. *Stetson* v. *Kempton*, 13 Mass. 272. *Anthony* v. *Adams*, 1 Met. 284. *Minot* v. *West Roxbury*, 112 Mass. 1. *Greenough* v. *Wakefield*, 127 Mass. 275. *Mead* v. *Acton*, 139 Mass. 341, 344. *Spaulding* v. *Peabody*, 153 Mass. 129.

The question then arises as to the effect of the agreement of 1894.

The St. of 1797, c. 74, was expressly repealed by the St. of 1847, c. 94, § 4, and while this act, in § 1, gave to the town of Falmouth the power, at any legal meeting called for the purpose, to " prescribe the times, places, and manner of taking alewives or herrings in Dexter's River and other waters connecting Coonamesset Pond with the Vineyard Sound or sea; and also in the other rivers, streams, and ponds which have heretofore been used by the inhabitants of said towns as herring fisheries," and while power was also given the town at said meeting to " adopt such further rules and regulations as may by them be deemed expedient for the preservation of said fishery," we find no mention made of any power to enter upon the lands of another, or to interfere with dams across any stream. Nor was there at that time any general law upon the subject.

By the St. of 1869, c. 384, provision was made for the appointment by the Governor of a board of commissioners on inland fisheries. Section 1 provides: " All the laws of the Commonwealth relating to the culture, preservation, capture, or passage of fish, shall be known as the laws relating to inland fisheries." Section 3 provides: " Each of said commissioners may personally, or by deputy, enforce all laws regulating inland fisheries ; and may seize and remove, summarily, if need be, all obstructions to the passage of migratory fish illegally used, except dams, mills, or machinery, at the expense of the persons using or maintaining the same." By § 4 it is provided : " Whenever either of said commissioners finds that there is no fishway or an insufficient fishway in or around a dam where the

law requires a fishway to be kept and maintained," he may enter and improve the fishway, or cause one to be constructed where none exists.

This law is still in force. Pub. Sts. c. 91, §§ 1-4, 6-8. To what extent it supersedes powers previously granted to towns by special laws it is unnecessary in this case to consider; for there is nothing in the act which gives towns any power over dams. It may also be noticed that, while in some special acts passed since the Public Statutes power has been given to the selectmen of certain towns to remove obstructions in streams, no power is given to remove dams. See Sts. 1882, c. 189; 1891, c. 164, §§ 2, 3; 1893, c. 36, § 3; 1894, c. 134, § 3; 1895, c. 203, § 3.

The plaintiffs further contend that the contracts are valid under the Pub. Sts. c. 27, § 9, re-enacting the Rev. Sts. c. 15, § 11, and the Gen. Sts. c. 18, § 9. The language is, that towns " may make contracts necessary and convenient for the exercise of their corporate powers." But the construction which has been put upon this section, is that " they cannot engage in enterprises foreign to the purposes for which they were incorporated, nor assume responsibilities which involve undertakings not within the compass of their corporate powers." *Vincent* v. *Nantucket,* 12 Cush. 103, 106.

By the Pub. Sts. c. 91, § 63, it is provided: " A city or town may open ditches, sluiceways, or canals into any pond within its limits, for the introduction and propagation of herrings or alewives, and for the creation of fisheries for the same ; and the land for opening such ditches, sluiceways, or canals within such city or town may be taken according to the provisions of the statutes which regulate and limit the taking of land for highways." This was first enacted in the St. of 1866, c. 187, § 3.

Under this statute the plaintiffs contend that the town may fulfil the contract of 1894, either by purchasing the lands and dams above Parker's Pond, or by acquiring the right to such land as shall be required for extending Dutchman's Ditch directly into Parker's Pond. It seems to us that there are two answers to this contention. The first is, that, if any such scheme had been in the contemplation of the parties, it would have been expressed in the covenant : and, considering the situation

of affairs in 1894, it cannot be read into it. The second is, that to take the land on which the dams are, or to take land for the purpose of cutting a canal to supply the plaintiffs with water, when not needed for the purpose of a fishery, and when not done for this purpose, would clearly not be within the scope of the act, and would be invalid. *Austin* v. *Murray,* 16 Pick. 121, 126. *Watertown* v. *Mayo,* 109 Mass. 315, 320. *In re Niagara Falls & Whirlpool Railway,* 108 N. Y. 375. *Forbes* v. *Delashmutt,* 68 Iowa, 164. *Ligare* v. *Chicago,* 139 Ill. 46.

*Bill dismissed.*